GREENHOLTZ, CHAIRMAN, BOARD OF PAROLE OF NEBRASKA, ET AL. *v.* INMATES OF THE NEBRASKA PENAL AND CORRECTIONAL COMPLEX ET AL.

No. 78–201.  Argued January 17, 1979—Decided May 29, 1979

1

2

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. POWELL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 18. MARSHALL,

J., filed an opinion dissenting in part, in which BRENNAN and STEVENS, JJ., joined, *post,* p. 22.

*Ralph H. Gillan,* Assistant Attorney General of Nebraska, argued the cause for petitioners. With him on the brief was *Paul L. Douglas,* Attorney General.

*Brian K. Ridenour* argued the cause and filed a brief for respondents.

*William Alsup* argued the cause for the United States as *amicus curiae.* On the brief were *Solicitor General McCree, Assistant Attorney General Heymann, Deputy Solicitor General Easterbrook,* and *William G. Otis.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the Due Process Clause of the Fourteenth Amendment applies to discretionary parole-release determinations made by the Nebraska Board of Parole, and, if so, whether the procedures the Board currently provides meet constitutional requirements.

I

Inmates of the Nebraska Penal and Correctional Complex brought a class action under 42 U. S. C. § 1983 claiming that they had been unconstitutionally denied parole by the Board

---

*Briefs of *amici curiae* urging reversal were filed by *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney General, and *John T. Murphy* and *Karl S. Mayer,* Deputy Attorneys General, for the State of California; and by *Larry Derryberry,* Attorney General, and *John F. Fischer II,* Assistant Attorney General, for the State of Oklahoma.

*Alvin J. Bronstein* and *Dean Hill Rivkin* filed a brief for the National Prison Project of the American Civil Liberties Union Foundation as *amicus curiae* urging affirmance.

*Pierce O'Donnell* and *Robert L. Weinberg* filed a brief for the Jerome N. Frank Legal Services Organization et al. as *amici curiae.*

of Parole. The suit was filed against the individual members of the Board. One of the claims of the inmates was that the statutes and the Board's procedures denied them procedural due process.

The statutes provide for both mandatory and discretionary parole. Parole is automatic when an inmate has served his maximum term, less good-time credits. Neb. Rev. Stat. § 83–1,107 (1)(b) (1976). An inmate becomes eligible for discretionary parole when the minimum term, less good-time credits, has been served. § 83–1,110 (1). Only discretionary parole is involved in this case.

The procedures used by the Board to determine whether to grant or deny discretionary parole arise partly from statutory provisions and partly from the Board's practices. Two types of hearings are conducted: initial parole review hearings and final parole hearings. At least once each year initial review hearings must be held for every inmate, regardless of parole eligibility. § 83–192 (9).[1] At the initial review hearing, the Board examines the inmate's entire preconfinement and postconfinement record. Following that examination it provides an informal hearing; no evidence as such is introduced, but the Board interviews the inmate and considers any letters or statements that he wishes to present in support of a claim for release.

If the Board determines from its examination of the entire record and the personal interview that he is not yet a good risk for release, it denies parole, informs the inmate why release was deferred and makes recommendations designed to

---

[1] The statute defines the scope of the initial review hearing as follows:

"Such review shall include the circumstances of the offender's offense, the presentence investigation report, his previous social history and criminal record, his conduct, employment, and attitude during commitment, and the reports of such physical and mental examinations as have been made. The board shall meet with such offender and counsel him concerning his progress and his prospects for future parole . . . ." Neb. Rev. Stat. § 83–192 (9) (1976).

help correct any deficiencies observed. It also schedules another initial review hearing to take place within one year.

If the Board determines from the file and the initial review hearing that the inmate is a likely candidate for release, a final hearing is scheduled. The Board then notifies the inmate of the month in which the final hearing will be held; the exact day and time is posted on a bulletin board that is accessible to all inmates on the day of the hearing. At the final parole hearing, the inmate may present evidence, call witnesses and be represented by private counsel of his choice. It is not a traditional adversary hearing since the inmate is not permitted to hear adverse testimony or to cross-examine witnesses who present such evidence. However, a complete tape recording of the hearing is preserved. If parole is denied, the Board furnishes a written statement of the reasons for the denial within 30 days. § 83–1,111 (2).[2]

## II

The District Court held that the procedures used by the Parole Board did not satisfy due process. It concluded that the inmate had the same kind of constitutionally protected "conditional liberty" interest, recognized by this Court in *Morrissey* v. *Brewer*, 408 U. S. 471 (1972), held that some of the procedures used by the Parole Board fell short of constitutional guarantees, and prescribed several specific requirements.

On appeal, the Court of Appeals for the Eighth Circuit agreed with the District Court that the inmate had a *Morrissey*-type, conditional liberty interest at stake and also found a

---

[2] Apparently, over a 23-month period, there were eight cases with letters of denial that did not include a statement of reasons for the denial. A representative of the Board of Parole testified at trial that these were departures from standard practice. There is nothing to indicate that these inmates could not have received a statement if they had requested one or that a direct challenge to this departure from the statute would not have produced relief. See Neb. Rev. Stat. § 25–1901 *et seq.* (1975).

6

statutorily defined, protectible interest in Neb. Rev. Stat. § 83–1,114 (1976). The Court of Appeals, however, 576 F. 2d 1274, 1285, modified the procedures required by the District Court as follows:

(a) When eligible for parole each inmate must receive a full formal hearing;

(b) the inmate is to receive written notice of the precise time of the hearing reasonably in advance of the hearing, setting forth the factors which may be considered by the Board in reaching its decision;

(c) subject only to security considerations, the inmate may appear in person before the Board and present documentary evidence in his own behalf. Except in unusual circumstances, however, the inmate has no right to call witnesses in his own behalf;

(d) a record of the proceedings, capable of being reduced to writing, must be maintained; and

(e) within a reasonable time after the hearing, the Board must submit a full explanation, in writing, of the facts relied upon and reasons for the Board's action denying parole.

The court's holding mandating the foregoing procedures for parole determinations conflicts with decisions of other Courts of Appeals, see, e. g., Brown v. Lundgren, 528 F. 2d 1050 (CA5), cert. denied, 429 U. S. 917 (1976); Scarpa v. United States Board of Parole, 477 F. 2d 278 (CA5) (en banc), vacated as moot, 414 U. S. 809 (1973); Scott v. Kentucky Parole Board, No. 74–1899 (CA6 Jan. 15, 1975), vacated and remanded to consider mootness, 429 U. S. 60 (1976). See also Franklin v. Shields, 569 F. 2d 784, 800 (CA4 1977), cert. denied, 435 U. S. 1003 (1978); United States ex rel. Richerson v. Wolff, 525 F. 2d 797 (CA7 1975), cert. denied, 425 U. S. 914 (1976). We granted certiorari to resolve the Circuit conflicts. 439 U. S. 817.

## III

The Due Process Clause applies when government action deprives a person of liberty or property; accordingly, when there is a claimed denial of due process we have inquired into the nature of the individual's claimed interest.

> "[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." *Board of Regents* v. *Roth,* 408 U. S. 564, 570–571 (1972).

This has meant that to obtain a protectible right

> "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.,* at 577.

There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence. The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with all its procedural safeguards, has extinguished that liberty right: "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty." *Meachum* v. *Fano,* 427 U. S. 215, 224, (1976).

Decisions of the Executive Branch, however serious their impact, do not automatically invoke due process protection; there simply is no constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations. See *Id.,* at 225; *Montanye* v. *Haymes,* 427 U. S. 236 (1976); *Moody* v. *Daggett,* 429 U. S. 78, 88 n. 9 (1976). This is especially true with respect to the sensitive choices presented by the administrative decision to grant parole release.

A state may, as Nebraska has, establish a parole system, but it has no duty to do so. Moreover, to insure that the

state-created parole system serves the public-interest purposes of rehabilitation and deterrence,[3] the state may be specific or general in defining the conditions for release and the factors that should be considered by the parole authority. It is thus not surprising that there is no prescribed or defined combination of facts which, if shown, would mandate release on parole. Indeed, the very institution of parole is still in an experimental stage. In parole releases, like its siblings probation release and institutional rehabilitation, few certainties exist. In each case, the decision differs from the traditional mold of judicial decisionmaking in that the choice involves a synthesis of record facts and personal observation filtered through the experience of the decisionmaker and leading to a predictive judgment as to what is best both for the individual inmate and for the community.[4] This latter conclusion requires the Board to assess whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense, weaken the deterrent impact on others, and undermine respect for the administration of justice. The entire inquiry is, in a sense, an "equity" type judgment that cannot always be articulated in traditional findings.

## IV

Respondents suggest two theories to support their view that they have a constitutionally protected interest in a parole determination which calls for the process mandated by the Court of Appeals. First, they claim that a reasonable entitlement is created whenever a state provides for the *possibility*

---

[3] These are the traditional justifications advanced to support the adoption of a system of parole. See generally A. von Hirsch & K. Hanrahan, Abolish Parole? 3 (1978); N. Morris, The Future of Imprisonment 47 (1974); J. Wilson, Thinking About Crime 171 (1975); D. Stanley, Prisoners Among Us 59, 76 (1976); Dawson, The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice, 1966 Wash. U. L. Q. 243, 249.

[4] See Stanley, *supra* n. 3, at 50–55; Dawson, *supra* n. 3, at 287–288.

of parole. Alternatively, they claim that the language in Nebraska's statute, Neb. Rev. Stat. § 83–1,114 (1) (1976), creates a legitimate expectation of parole, invoking due process protections.

### A

In support of their first theory, respondents rely heavily on *Morrissey* v. *Brewer*, 408 U. S. 471 (1972), where we held that a parole-revocation determination must meet certain due process standards. See also *Gagnon* v. *Scarpelli*, 411 U. S. 778 (1973). They argue that the ultimate interest at stake both in a parole-revocation decision and in a parole determination is conditional liberty and that since the underlying interest is the same the two situations should be accorded the same constitutional protection.

The fallacy in respondents' position is that parole *release* and parole *revocation* are quite different. There is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires. The parolees in *Morrissey* (and probationers in *Gagnon*) were at liberty and as such could "be gainfully employed and [were] free to be with family and friends and to form the other enduring attachments of normal life." 408 U. S., at 482. The inmates here, on the other hand, are confined and thus subject to all of the necessary restraints that inhere in a prison.

A second important difference between discretionary parole *release* from confinement and *termination* of parole lies in the nature of the decision that must be made in each case. As we recognized in *Morrissey*, the parole-revocation determination actually requires two decisions: whether the parolee in fact acted in violation of one or more conditions of parole and whether the parolee should be recommitted either for his or society's benefit. *Id.*, at 479–480. "The first step in a revocation decision thus involves a wholly retrospective factual question." *Id.*, at 479.

The parole-release decision, however, is more subtle and

depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release.   Unlike the revocation decision, there is no set of facts which, if shown, mandate a decision favorable to the individual.   The parole determination, like a prisoner-transfer decision, may be made

> "for a variety of reasons and often involve[s] no more than informed predictions as to what would best serve [correctional purposes] or the safety and welfare of the inmate."   *Meachum* v. *Fano,* 427 U. S., at 225.

The decision turns on a "discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done."   Kadish, The Advocate and the Expert—Counsel in the Peno-Correctional Process, 45 Minn. L. Rev. 803, 813 (1961).

The differences between an initial grant of parole and the revocation of the conditional liberty of the parolee are well recognized.   In *United States ex rel. Bey* v. *Connecticut Board of Parole,* 443 F. 2d 1079, 1086 (1971), the Second Circuit took note of this critical distinction:

> "It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom."

Judge Henry Friendly cogently noted that "there is a human difference between losing what one has and not getting what one wants."   Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1296 (1975).   See also *Brown* v. *Lundgren,* 528 F. 2d, at 1053; *Scarpa* v. *United States Board of Parole,* 477 F. 2d, at 282; *Franklin* v. *Shields,* 569 F. 2d, at 799 (Field, J., dissenting); *United States ex rel. Johnson* v. *Chairman, New*

*York State Board of Parole,* 500 F. 2d 925, 936 (CA2 1974) (Hay, J., dissenting).

That the state holds out the *possibility* of parole provides no more than a mere hope that the benefit will be obtained. *Board of Regents* v. *Roth,* 408 U. S., at 577. To that extent the general interest asserted here is no more substantial than the inmate's hope that he will not be transferred to another prison, a hope which is not protected by due process. *Meachum* v. *Fano,* 427 U. S., at 225; *Montanye* v. *Haymes, supra.*

B

Respondents' second argument is that the Nebraska statutory language itself creates a protectible expectation of parole. They rely on the section which provides in part:

"Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it shall order his release unless it is of the opinion that his release should be deferred because:

"(a) There is a substantial risk that he will not conform to the conditions of parole;

"(b) His release would depreciate the seriousness of his crime or promote disrespect for law;

"(c) His release would have a substantially adverse effect on institutional discipline; or

"(d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date." Neb. Rev. Stat. § 83–1,114 (1) (1976).[5]

Respondents emphasize that the structure of the provision together with the use of the word "shall" binds the Board of

---

[5] The statute also provides a list of 14 explicit factors and one catchall factor that the Board is obligated to consider in reaching a decision. Neb. Rev. Stat. §§ 83–1,114 (2)(a)–(n) (1976). See Appendix to this opinion.

Parole to release an inmate unless any one of the four specifically designated reasons are found. In their view, the statute creates a presumption that parole release will be granted, and that this in turn creates a legitimate expectation of release absent the requisite finding that one of the justifications for deferral exists.

It is argued that the Nebraska parole-determination provision is similar to the Nebraska statute involved in *Wolff* v. *McDonnell,* 418 U. S. 539 (1974), that granted good-time credits to inmates. There we held that due process protected the inmates from the arbitrary loss of the statutory right to credits because they were provided subject only to good behavior. We held that the statute created a liberty interest protected by due process guarantees. The Board argues in response that a presumption would be created only if the statutory conditions for deferral were essentially factual, as in *Wolff* and *Morrissey,* rather than predictive.

Since respondents elected to litigate their due process claim in federal court, we are denied the benefit of the Nebraska courts' interpretation of the scope of the interest, if any, the statute was intended to afford to inmates. See *Bishop* v. *Wood,* 426 U. S. 341, 345 (1976). We can accept respondents' view that the expectancy of release provided in this statute is entitled to some measure of constitutional protection. However, we emphasize that this statute has unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis. We therefore turn to an examination of the statutory procedures to determine whether they provide the process that is due in these circumstances.

It is axiomatic that due process "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U. S., at 481; *Cafeteria & Restaurant Workers* v. *McElroy,* 367 U. S. 886, 895 (1961); *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 162–

163 (1951) (Frankfurter, J., concurring). The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error. *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976).

Here, as we noted previously, the Parole Board's decision as defined by Nebraska's statute is necessarily subjective in part and predictive in part. Like most parole statutes, it vests very broad discretion in the Board. No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of the actual parole decisionmakers in predicting future behavior. Our system of federalism encourages this state experimentation. If parole determinations are encumbered by procedures that states regard as burdensome and unwarranted, they may abandon or curtail parole. Cf. Me. Rev. Stat. Ann., Tit. 34, §§ 1671–1679 (1964), repealed, 1975 Me. Acts, ch. 499, § 71 (repealing the State's parole system).

It is important that we not overlook the ultimate purpose of parole which is a component of the long-range objective of rehabilitation. The fact that anticipations and hopes for rehabilitation programs have fallen far short of expectations of a generation ago need not lead states to abandon hopes for those objectives; states may adopt a balanced approach in making parole determinations, as in all problems of administering the correctional systems. The objective of rehabilitating convicted persons to be useful, law-abiding members of society can remain a goal no matter how disappointing the progress. But it will not contribute to these desirable

objectives to invite or encourage a continuing state of adversary relations between society and the inmate.

Procedures designed to elicit specific facts, such as those required in *Morrissey, Gagnon,* and *Wolff,* are not necessarily appropriate to a Nebraska parole determination. See *Board of Curators, Univ. of Missouri* v. *Horowitz,* 435 U. S. 78, 90 (1978); *Cafeteria & Restaurant Workers* v. *McElroy, supra,* at 895. Merely because a statutory expectation exists cannot mean that in addition to the full panoply of due process required to convict and confine there must also be repeated, adversary hearings in order to continue the confinement. However, since the Nebraska Parole Board provides at least one and often two hearings every year to each eligible inmate, we need only consider whether the additional procedures mandated by the Court of Appeals are required under the standards set out in *Mathews* v. *Eldridge, supra,* at 335, and *Morrissey* v. *Brewer, supra,* at 481.

Two procedures mandated by the Court of Appeals are particularly challenged by the Board: [6] the requirement that a formal hearing be held for every inmate, and the requirement that every adverse parole decision include a statement of the evidence relied upon by the Board.

The requirement of a hearing as prescribed by the Court of Appeals in all cases would provide at best a negligible decrease in the risk of error. See D. Stanley, Prisoners Among Us 43 (1976). When the Board defers parole after the initial review

[6] The Board also objects to the Court of Appeals' order that it provide written notice reasonably in advance of the hearing together with a list of factors that might be considered. At present the Board informs the inmate in advance of the month during which the hearing will be held, thereby allowing time to secure letters or statements; on the day of the hearing it posts notice of the exact time. There is no claim that either the timing of the notice or its substance seriously prejudices the inmate's ability to prepare adequately for the hearing. The present notice is constitutionally adequate.

hearing, it does so because examination of the inmate's file and the personal interview satisfies it that the inmate is not yet ready for conditional release. The parole determination therefore must include consideration of what the entire record shows up to the time of the sentence, including the gravity of the offense in the particular case. The behavior record of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release. At the Board's initial interview hearing, the inmate is permitted to appear before the Board and present letters and statements on his own behalf. He is thereby provided with an effective opportunity first, to insure that the records before the Board are in fact the records relating to his case; and second, to present any special considerations demonstrating why he is an appropriate candidate for parole. Since the decision is one that must be made largely on the basis of the inmate's files, this procedure adequately safeguards against serious risks of error and thus satisfies due process.[7] Cf. *Richardson* v. *Perales,* 402 U. S. 389, 408 (1971).

Next, we find nothing in the due process concepts as they have thus far evolved that requires the Parole Board to specify the particular "evidence" in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release. The Board communicates the reason for its denial as a guide to the inmate for his future behavior. See *Franklin* v. *Shields,* 569 F. 2d, at 800 (en banc). To require the parole authority to provide a summary of the evidence would tend to convert the process into an adversary proceeding and to equate the Board's

---

[7] The only other possible risk of error is that relevant adverse factual information in the inmate's file is wholly inaccurate. But the Board has discretion to make available to the inmate any information "[w]henever the board determines that it will facilitate the parole hearing." Neb. Rev. Stat. § 83–1,112 (1) (1976). Apparently the inmates are satisfied with the way this provision is administered since there is no issue before us regarding access to their files.

parole-release determination with a guilt determination. The Nebraska statute contemplates, and experience has shown, that the parole-release decision is, as we noted earlier, essentially an experienced prediction based on a host of variables. See Dawson, The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice, 1966 Wash. U. L. Q. 243, 299–300. The Board's decision is much like a sentencing judge's choice—provided by many states—to grant or deny probation following a judgment of guilt, a choice never thought to require more than what Nebraska now provides for the parole-release determination. Cf. *Dorszynski* v. *United States,* 418 U. S. 424 (1974). The Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more.

Accordingly, the judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.[8]

*So ordered.*

## APPENDIX TO OPINION OF THE COURT

The statutory factors that the Board is required to take into account in deciding whether or not to grant parole are the following:

(a) The offender's personality, including his maturity, sta-

---

[8] The Court of Appeals in its order required the Board to permit all inmates to appear and present documentary support for parole. Since both of these requirements were being complied with prior to this litigation, the Board did not seek review of those parts of the court's order and the validity of those requirements is not before us. The Court of Appeals also held that due process did not provide a right to cross-examine adverse witnesses or a right to present favorable witnesses. The practice of taping the hearings also was declared adequate. Those issues are not before us and we express no opinion on them.

bility, sense of responsibility and any apparent development in his personality which may promote or hinder his conformity to law;

(b) The adequacy of the offender's parole plan;

(c) The offender's ability and readiness to assume obligations and undertake responsibilities;

(d) The offender's intelligence and training;

(e) The offender's family status and whether he has relatives who display an interest in him or whether he has other close and constructive associations in the community;

(f) The offender's employment history, his occupational skills, and the stability of his past employment;

(g) The type of residence, neighborhood or community in which the offender plans to live;

(h) The offender's past use of narcotics, or past habitual and excessive use of alcohol;

(i) The offender's mental or physical makeup, including any disability or handicap which may affect his conformity to law;

(j) The offender's prior criminal record, including the nature and circumstances, recency and frequency of previous offenses;

(k) The offender's attitude toward law and authority;

(l) The offender's conduct in the facility, including particularly whether he has taken advantage of the opportunities for self-improvement, whether he has been punished for misconduct within six months prior to his hearing or reconsideration for parole release, whether any reductions of term have been forfeited, and whether such reductions have been restored at the time of hearing or reconsideration;

(m) The offender's behavior and attitude during any previous experience of probation or parole and the recency of such experience; and

(n) Any other factors the board determines to be relevant. Neb. Rev. Stat. § 83–1,114 (2) (1976).

MR. JUSTICE POWELL, concurring in part and dissenting in part.

I agree with the Court that the respondents have a right under the Fourteenth Amendment to due process in the consideration of their release on parole. I do not believe, however, that the applicability of the Due Process Clause to parole-release determinations depends upon the particular wording of the statute governing the deliberations of the parole board, or that the limited notice of the final hearing currently given by the State is consistent with the requirements of due process.

I

A substantial liberty from legal restraint is at stake when the State makes decisions regarding parole or probation. Although still subject to limitations not imposed on citizens never convicted of a crime, the parolee enjoys a liberty incomparably greater than whatever minimal freedom of action he may have retained within prison walls, a fact that the Court recognized in *Morrissey* v. *Brewer*, 408 U. S. 471 (1972).

> "The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. . . . Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison." *Id.,* at 482.

Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action. *Ingraham* v. *Wright*, 430 U. S. 651, 673–674 (1977); *Board of Regents* v. *Roth*, 408

U. S. 564, 572 (1972). Because this fundamental liberty "is valuable" and "its termination inflicts a 'grievous loss' on the parolee," the Court concluded in *Morrissey* that the decision to revoke parole must be made in conformity with due process standards. 408 U. S., at 482. Similarly in *Gagnon* v. *Scarpelli*, 411 U. S. 778 (1973), we held that a probationer must be accorded due process when a decision is to be made about the continuation of his probation. And the decision to rescind a prisoner's "good-time credits," which directly determine the time at which he will be eligible for parole, also must be reached in compliance with due process requirements. *Wolff* v. *McDonnell*, 418 U. S. 539 (1974).

In principle, it seems to me that the Due Process Clause is no less applicable to the parole-release determination than to the decisions by state agencies at issue in the foregoing cases. Nothing in the Constitution requires a State to provide for probation or parole. But when a State adopts a parole system that applies general standards of eligibility, prisoners justifiably expect that parole will be granted fairly and according to law whenever those standards are met. This is so whether the governing statute states, as here, that parole "shall" be granted unless certain conditions exist, or provides some other standard for making the parole decision. Contrary to the Court's conclusion, *ante*, at 9–11, I am convinced that the presence of a parole system is sufficient to create a liberty interest, protected by the Constitution, in the parole-release decision.

The Court today, however, concludes that parole release and parole revocation "are quite different," because " 'there is a . . . difference between losing what one has and not getting what one wants,' " *ante*, at 9, 10. I am unpersuaded that this difference, if indeed it exists at all, is as significant as the Court implies. Release on parole marks the first time when the severe restrictions imposed on a prisoner's liberty by the prison regimen may be lifted, and his behavior in prison

often is molded by his hope and expectation of securing parole at the earliest time permitted by law. Thus, the parole-release determination may be as important to the prisoner as some later, and generally unanticipated, parole-revocation decision. Moreover, whatever difference there may be in the subjective reactions of prisoners and parolees to release and revocation determinations is not dispositive. From the day that he is sentenced in a State with a parole system, a prisoner justifiably expects release on parole when he meets the standards of eligibility applicable within that system. This is true even if denial of release will be a less severe disappointment than revocation of parole once granted.

I am unconvinced also by the Court's suggestion that the prisoner has due process rights in the context of parole revocation but not parole release because of the different "nature of the decision that must be made in each case." *Ante,* at 9. It is true that the parole-revocation determination involves two inquiries: the parole board must ascertain the facts related to the prisoner's behavior on parole, and must then make a judgment whether or not he should be returned to prison. But unless the parole board makes parole-release determinations in some arbitrary or random fashion, these subjective evaluations about future success on parole also must be based on retrospective factual findings. See *ante,* at 14–15. In addition, it seems to me that even if there were any systematic difference between the factual inquiries relevant to release and revocation determinations, this difference, under currently existing parole systems, would be too slight to bear on the existence of a liberty interest protected by the Due Process Clause. It might be relevant, of course, in determining the process to be accorded in each setting.

## II

The Court correctly concludes, in my view, that the Court of Appeals erred in ordering that a formal hearing be held for every inmate and that every adverse parole decision in-

clude a statement of the evidence relied upon by the Board. *Ante,* at 14–16. The type of hearing afforded by Nebraska comports generously with the requirements of due process, and the report of the Board's decision also seems adequate. Accordingly, I agree that the judgment of the Court of Appeals must be reversed and the case remanded.

I do not agree, however, with the Court's decision that the present notice afforded to prisoners scheduled for final hearings (as opposed to initial review hearings) is constitutionally adequate. *Ante,* at 14 n. 6. Under present procedures, a prisoner is told in advance the month during which his final hearing will be held, but is not notified of the exact date of the hearing until the morning of the day that it will occur. Thus, although a prisoner is allowed to "present evidence, call witnesses and be represented by private counsel," *ante,* at 5, at the final hearing, his ability to do so necessarily is reduced or nullified completely by the State's refusal to give notice of the hearing more than a few hours in advance.

The Court's opinion asserts that "[t]here is no claim that . . . the timing of the notice . . . seriously prejudices the inmate's ability to prepare adequately for the hearing." *Ante,* at 14 n. 6. But the original complaint in this case cited as an alleged denial of due process the State's failure to "inform the [respondents] in advance of the date and time of their hearings before the Board of Parole." The District Court ordered the petitioners to give prisoners notice of hearings at least 72 hours in advance of the hearings, and the Court of Appeals affirmed that order. The respondents have supported that judgment in this Court by arguing that the courts below correctly determined that the current notice procedure undermines the prisoner's ability to present his case adequately at the final review hearing. Brief for Respondents 65. This conclusion accords with common sense, despite the petitioners' comment that prisoners "are seldom gone on vacation or have conflicting appointments on the day their parole hear-

ing is set." Brief for Petitioners 30. It also imposes only a minimal burden on the State. I therefore agree with the decision of the courts below to require the State to give at least three days' notice of final hearings, and I would not require the Court of Appeals to modify this portion of its judgment on remand.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE STEVENS join, dissenting in part.

My disagreement with the Court's opinion extends to both its analysis of respondents' liberty interest and its delineation of the procedures constitutionally required in parole release proceedings. Although it ultimately holds that the Nebraska statutes create a constitutionally protected "expectation of parole," the Court nonetheless rejects the argument that criminal offenders have such an interest whenever a State establishes the possibility of parole. This gratuitous commentary reflects a misapplication of our prior decisions and an unduly narrow view of the liberty protected by the Fourteenth Amendment. Since the Court chooses to address the issue, I must register my opinion that *all* prisoners potentially eligible for parole have a liberty interest of which they may not be deprived without due process, regardless of the particular statutory language that implements the parole system.

The Court further determines that the Nebraska Board of Parole already provides all the process that is constitutionally due. In my view, the Court departs from the analysis adopted in *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), and *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976), and disregards considerations that militate for greater procedural protection. To supplement existing procedures, I would require that the Parole Board give each inmate reasonable notice of hearing dates and the factors to be considered, as well as a written statement of reasons and the essential facts underlying adverse decisions.

## I

## A

It is self-evident that all individuals possess a liberty interest in being free from physical restraint. Upon conviction for a crime, of course, an individual may be deprived of this liberty to the extent authorized by penal statutes.[1] But when a State enacts a parole system, and creates the possibility of release from incarceration upon satisfaction of certain conditions, it necessarily qualifies that initial deprivation. In my judgment, it is the existence of this system which allows prison inmates to retain their protected interest in securing freedoms available outside prison.[2] Because parole release proceedings clearly implicate this retained liberty interest, the Fourteenth Amendment requires that due process be observed, irrespective of the specific provisions in the applicable parole statute.

This Court's prior decisions fully support the conclusion that criminal offenders have a liberty interest in securing parole release. In *Morrissey* v. *Brewer, supra,* the Court held that all persons released on parole possess such an interest in remaining free from incarceration. Writing for the Court, MR. CHIEF JUSTICE BURGER stated that the appli-

---

[1] A criminal conviction cannot, however, terminate all liberty interests. *Wolff* v. *McDonnell,* 418 U. S. 539, 555–556 (1974); see, *e. g., Procunier* v. *Navarette,* 434 U. S. 555 (1978); *Bounds* v. *Smith,* 430 U. S. 817 (1977); *Pell* v. *Procunier,* 417 U. S. 817, 822 (1974); *Cruz* v. *Beto,* 405 U. S. 319 (1972); *Wilwording* v. *Swenson,* 404 U. S. 249 (1971); *Cooper* v. *Pate,* 378 U. S. 546 (1964); *Ex parte Hull,* 312 U. S. 546 (1941); *Weems* v. *United States,* 217 U. S. 349 (1910). See also *Carmona* v. *Ward,* 439 U. S. 1091 (1979) (MARSHALL, J., dissenting).

[2] See *Bell* v. *Wolfish,* 441 U. S. 520, 568–571 (1979) (MARSHALL, J., dissenting); *id.,* at 580–584 (STEVENS, J., dissenting); *Leis* v. *Flynt,* 439 U. S. 438, 448–453 (1979) (STEVENS, J., dissenting); *Meachum* v. *Fano,* 427 U. S. 215, 230 (1976) (STEVENS, J., dissenting); cf. *Bell* v. *Wolfish, supra,* at 535–536, 545. See generally *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 842–847 (1977).

cability of due process protections turns "on the extent to which an individual will be 'condemned to suffer grievous loss,'" citing *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring), and on the "nature of the interest." 408 U. S., at 481. In assessing the gravity and nature of the loss caused by parole revocation, *Morrissey* relied on the general proposition that parole release enables an individual "to do a wide range of things open to persons who have never been convicted of any crime." *Id.,* at 482.[3] Following *Morrissey, Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), held that individuals on probation also retain a liberty interest which cannot be terminated without due process of law. Nowhere in either opinion did the Court even intimate that the weight or nature of the criminal offender's interest in maintaining his parole release or probation depends upon the specific terms of any statute, for in both cases the Court disregarded the applicable statutory language.[4] Rather, this liberty interest derived solely from the

---

[3] Because parolees' enjoyment of these freedoms was subject to a number of restrictions, the Court characterized their liberty interest as "conditional." See 408 U. S., at 480. The risk that violation of those conditions could lead to termination of parole status, however, did not diminish the significance of the parolees' interest, since the Due Process Clause anticipates that most liberty interests may be abrogated under proper circumstances. So, too, here, respondents' interest does not forfeit constitutional protection simply because their freedom would also be subject to conditions or because of the possibility that the Nebraska Parole Board will deny release after providing due process of law.

[4] The state law in *Morrissey,* quoted only in the dissenting opinion, provided that "'[a]ll paroled prisoners . . . shall be subject, at any time, to be taken into custody and returned to the institution . . . .'" 408 U. S., at 493 n. 2 (Douglas, J., dissenting in part). The statute specified no other criteria for parole revocation. Thus, had the Court relied solely on particular statutory language, it could not have held that parolees possess a constitutionally protected interest in continuing their status. In *Scarpelli,* the Court completely ignored the pertinent statutory language. See 411 U. S., at 781–782.

existence of a system that permitted criminal offenders to serve their sentences on probation or parole.

*Wolff* v. *McDonnell*, 418 U. S. 539 (1974), adopted a similar approach. There, the Court concluded that abrogation of a prisoner's good-time credits implicates his interest in subsequently obtaining release from incarceration. Although the Court recognized that Nebraska was not constitutionally obligated to establish a credit system, by creating "a right to a shortened prison sentence through the accumulation of credits for good behavior," *id.*, at 557, the State had allowed inmates to retain a liberty interest that could be terminated only for "serious misbehavior." This liberty interest derived from the existence of a credit system, not from the specific language of the implementing statute, see *id.*, at 555–558, as decisions applying *Wolff* have consistently recognized.[5]

## B

A criminal offender's interest in securing release on parole is therefore directly comparable to the liberty interests we

---

[5] Cf. *Baxter* v. *Palmigiano*, 425 U. S. 308, 323–324 (1976). Lower courts have understood *Wolff* to require due process safeguards whenever good-time credits are revoked, and have not focused on the language of various statutory provisions. See, *e. g.*, *Franklin* v. *Shields*, 569 F. 2d 784, 788–790, 800–801 (CA4) (en banc), cert. denied, 435 U. S. 1003 (1978); *United States ex rel. Larkins* v. *Oswald*, 510 F. 2d 583 (CA2 1975); *Gomes* v. *Travisono*, 510 F. 2d 537 (CA1 1974); *Willis* v. *Ciccone*, 506 F. 2d 1011, 1017 (CA8 1974); *Workman* v. *Mitchell*, 502 F. 2d 1201 (CA9 1974). See also *United States ex rel. Miller* v. *Twomey*, 479 F. 2d 701, 712–713 (CA7 1973) (Stevens, J.), cert. denied *sub nom. Gutierrez* v. *Department of Public Safety of Ill.*, 414 U. S. 1146 (1974).

*Meachum* v. *Fano*, 427 U. S. 215 (1976), signals no departure from the basic principles recognized in *Morrissey*, *Gagnon*, and *Wolff*. While the majority in *Meachum* concluded that the prisoners did not have a protected liberty interest in avoiding transfers between penal institutions, the Court's opinion rested on the absence of any limitation on such transfers rather than on particular statutory language. 427 U. S., at 225–228. See *Tracy* v. *Salamack*, 572 F. 2d 393, 395 n. 9 (CA2 1978); *Four Certain Unnamed Inmates* v. *Hall*, 550 F. 2d 1291, 1292 (CA1 1977).

recognized in *Morrissey, Scarpelli,* and *Wolff.* However, because the Court discerns two distinctions between "parole *release* and parole *revocation,*" *ante,* at 9, it refuses to follow these cases here. In my view, the proffered distinctions do not support this departure from precedent.

First, the Court finds a difference of constitutional dimension between a deprivation of liberty one has and a denial of liberty one desires. *Ibid.* While there is obviously some difference, it is not one relevant to the established constitutional inquiry. Whether an individual currently enjoys a particular freedom has no bearing on whether he possesses a protected interest in securing and maintaining that liberty. The Court acknowledged as much in *Wolff* v. *McDonnell, supra,* when it held that the loss of good-time credits implicates a liberty interest even though the forfeiture only deprived the prisoner of freedom he expected to obtain sometime hence. See *Drayton* v. *McCall,* 584 F. 2d 1208, 1219 (CA2 1978). And in other contexts as well, this Court has repeatedly concluded that the Due Process Clause protects liberty interests that individuals do not currently enjoy.[6]

The Court's distinction is equally unrelated to the nature

---

[6] See, *e. g., Willner* v. *Committee on Character and Fitness,* 373 U. S. 96 (1963); *Speiser* v. *Randall,* 357 U. S. 513 (1958); *Konigsberg* v. *State Bar,* 353 U. S. 252 (1957); *Schware* v. *Board of Bar Examiners,* 353 U. S. 232 (1957); *Simmons* v. *United States,* 348 U. S. 397 (1955); *Goldsmith* v. *Board of Tax Appeals,* 270 U. S. 117 (1926).

The Second Circuit has characterized the attempt to differentiate between a liberty interest currently enjoyed but subject to termination, and an interest that can be enjoyed in the future following an administrative proceeding, as actually "nothing more than a reincarnation of the right-privilege dichotomy in a not-too-deceptive disguise." *United States ex rel. Johnson* v. *Chairman of New York State Board of Parole,* 500 F. 2d 925, 927–928, n. 2, vacated as moot *sub nom. Regan* v. *Johnson,* 419 U. S. 1015 (1974), construing *United States ex rel. Bey* v. *Connecticut Board of Parole,* 443 F. 2d 1079, 1086 (CA2 1971), which the Court quotes *ante,* at 10; see Comment, The Parole System, 120 U. Pa. L. Rev. 282, 363 (1971).

or gravity of the interest affected in parole release proceedings. The nature of a criminal offender's interest depends on the range of freedoms available by virtue of the parole system's existence. On that basis, *Morrissey* afforded constitutional recognition to a parolee's interest because his freedom on parole includes "many of the core values of unqualified liberty." 408 U. S., at 482. This proposition is true regardless of whether the inmate is presently on parole or seeking parole release. As the Court of Appeals for the Second Circuit has recognized, "[w]hether the immediate issue be release or revocation, the stakes are the same: conditional freedom versus incarceration." *United States ex rel. Johnson* v. *Chairman of New York State Board of Parole,* 500 F. 2d 925, 928, vacated as moot *sub nom. Regan* v. *Johnson,* 419 U. S. 1015 (1974).

The Court's second justification for distinguishing between parole release and parole revocation is based on the "nature of the decision that must be made in each case." *Ante,* at 9. The majority apparently believes that the interest affected by parole release proceedings is somehow diminished if the administrative decision may turn on "subjective evaluations." Yet the Court nowhere explains why the *nature of the decisional process* has even the slightest bearing in assessing the *nature of the interest* that this process may terminate.[7] Indeed, the Court's reasoning here is flatly inconsistent with its subsequent holding that respondents do have a protected liberty interest under Nebraska's parole statutes, which require a decision that is "subjective in part and predictive in part." *Ante,* at 13. For despite the Parole Board's argument that such an interest exists "only if the statutory con-

---

[7] Government decisionmakers do not gain a "license for arbitrary procedure" when legislators confer a "substantial degree of discretion" regarding the assessment of subjective considerations. *Kent* v. *United States,* 383 U. S. 541, 553 (1966); see *Thorpe* v. *Housing Authority of City of Durham,* 386 U. S. 670, 678 (1967) (Douglas, J., concurring).

ditions for [denying parole are] essentially factual, as in *Wolff* and *Morrissey,* rather than predictive," *ante,* at 12, the Court nonetheless concludes that respondents' interest is sufficient to merit constitutional protection.

But even assuming the subjective nature of the decision-making process were relevant to due process analysis in general, this consideration does not adequately distinguish the processes of granting and revoking parole. See *Morrissey* v. *Brewer,* 408 U. S., at 477–480; *Gagnon* v. *Scarpelli,* 411 U. S., at 781–782. Contrary to the Court's assertion that the decision to revoke parole is predominantly a " 'retrospective factual question,' " *ante,* at 9, *Morrissey* recognized that only the first step in the revocation decision can be so characterized. And once it is

> "determined that the parolee did violate the conditions [of parole, a] second question arise[s]: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation? The first step is relatively simple; the second is more complex. The second question involves the application of expertise by the parole authority in making a prediction *as to the ability of the individual to live in society without committing antisocial acts.* . . . [T]his second step, deciding what to do about the violation once it is identified, *is not purely factual but also predictive and discretionary."* 408 U. S., at 479–480 (emphasis added).

*Morrissey* thus makes clear that the parole revocation decision includes a decisive subjective component. Moreover, to the extent parole release proceedings hinge on predictive determinations, those assessments are necessarily predicated on findings of fact.[8] Accordingly, the presence of subjective

---

[8] See *Franklin* v. *Shields,* 569 F. 2d, at 791; Dawson, The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice, 1966 Wash. U. L. Q. 243, 248–285; cf. *Morrissey* v. *Brewer,* 408 U. S., at

considerations is a completely untenable basis for distinguishing the interests at stake here from the liberty interest recognized in *Morrissey*.

## C

The Court also concludes that the existence of a parole system by itself creates "no more than a mere hope that the benefit will be obtained," *ante*, at 11, and thus does not give rise to a liberty interest. This conclusion appears somewhat gratuitous, given the Court's ultimate holding that the Nebraska statutes do generate a "legitimate expectation of [parole] release" which is protected by the Due Process Clause. *Ante*, at 12. Moreover, it is unclear what purpose can be served by the Court's endeavor to depreciate the expectations arising solely from the existence of a parole system. The parole statutes in many jurisdictions embody the same standards used in the Model Penal Code, upon which both the Nebraska and federal provisions are patterned, and the Court's analysis of the Nebraska statutes would therefore suggest that the other statutes must also create protectible expectations of release.[9]

---

479–480. The Nebraska statutes, in particular, demonstrate the factual nature of the parole release inquiry. One provision, quoted *ante*, at 16–18, enumerates factual considerations such as the inmate's intelligence, family status, and employment history, which bear upon the four predictive determinations underlying the ultimate parole decision. See *ante*, at 11.

[9] The parole statutes of 47 States establish particular standards, criteria, or factors to be applied in parole release determinations. A list of these statutes is set out in the Brief for Jerome N. Frank Legal Services Organization et al. as *Amici Curiae* 30–31, 23a–26a. These criteria presumably will be a significant source of inmates' "legitimate expectations" regarding the availability of parole. Expectations would also be shaped by the role that parole actually assumes in a jurisdiction's penological system, see *infra*, at 30–31. It is in these respects that most parole statutes are similar. While there are some differences in statutory language among jurisdictions, it is unrealistic to believe that variations such as the use of "may" rather than "shall," see *ante*, at 11–12, could negate the expectations derived from

Furthermore, in light of the role that parole has assumed in the sentencing process, I believe the Court misapplies its own test, see *ante,* at 11–12, by refusing to acknowledge that inmates have a legitimate expectation of release whenever the government establishes a parole system. As the Court observed in *Morrissey:*

> "During the past 60 years, the practice of releasing prisoners on parole before the end of their sentences has become an integral part of the penological system. . . . Rather than being an *ad hoc* exercise of clemency, parole is an established variation on imprisonment of convicted criminals." 408 U. S., at 477.

Indeed, the available evidence belies the majority's broad assumptions concerning inmate expectations, at least with respect to the federal system, and there is no suggestion that experience in other jurisdictions is significantly different.[10]

Government statistics reveal that substantially less than one-third of all first-time federal offenders are held in prison until mandatory release.[11] In addition, 88% of the judges responding to a recent survey stated that they considered the availability of parole when imposing sentence, and 47% acknowledged their expectation that defendants would be re-

---

experience with a parole system and the enumerated criteria for granting release.

[10] The New York State Parole Board, for example, granted parole in 75.4% of the cases it considered during 1972. See *United States ex rel. Johnson* v. *Chairman of New York State Board of Parole,* 500 F. 2d, at 928. In addition, recent studies show that parole is the method of release for approximately 70% of all criminal offenders returned each year to the community. Uniform Parole Reports, Parole in the United States: 1976 and 1977, p. 55 (1978). In some States, the figure is as high as 97%. See Kastenmeier & Eglit, Parole Release Decision-Making: Rehabilitation, Expertise, and the Demise of Mythology, 22 Am. U. L. Rev. 477, 481–482 (1973).

[11] See Brief for United States in *United States* v. *Addonizio,* O. T. 1978, No. 78–156, p. 55 n. 47.

leased on parole after serving one-third of their sentences.[12] In accord with these views, the Administrative Conference of the United States has advised Congress that courts set maximum sentences anticipating "that a prisoner who demonstrates his desire for rehabilitation will not serve the maximum term or anything approaching the maximum." [13] And in discussing the sentencing provisions of the proposed revision of the Federal Criminal Code, S. 1437, the Senate Judiciary Committee observed:

> "A federal judge who today believes that an offender should serve four years in prison may impose a sentence in the vicinity of ten years, knowing that the offender is eligible for parole release after one third of the sentence." S. Rep. No. 95–605, p. 1169 (1977).

Thus, experience in the federal system has led both judges and legislators to expect that inmates will be paroled substantially before their sentences expire. Insofar as it is critical under the Court's due process analysis, this understanding would certainly justify a similar expectation on the part of the federal inmates. Hence, I believe it is unrealistic for this Court to speculate that the existence of a parole system provides prisoners "no more than a mere hope" of release. *Ante,* at 11.

## II

### A

I also cannot subscribe to the Court's assessment of the procedures necessary to safeguard respondents' liberty interest. Although the majority purports to rely on *Morrissey* v.

---

[12] Project, Parole Release Decisionmaking and the Sentencing Process, 84 Yale L. J. 810, 882 n. 361 (1975).

[13] Hearings on H. R. 1598 and Identical Bills before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 93d Cong., 1st Sess., 163–164, 193 (1973) (testimony and statement of Antonin Scalia, Chairman of the Administrative Conference of the United States).

*Brewer* and the test enunciated in *Mathews* v. *Eldridge,* 424 U. S. 319 (1976), its application of these standards is fundamentally deficient in several respects.

To begin with, the Court focuses almost exclusively on the likelihood that a particular procedure will significantly reduce the risk of error in parole release proceedings. *Ante,* at 14–16. Yet *Mathews* advances *three* factors to be considered in determining the specific dictates of due process:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U. S., at 335.

By ignoring the other two factors set forth in *Mathews,* the Court skews the inquiry in favor of the Board. For example, the Court does not identify any justification for the Parole Board's refusal to provide inmates with specific advance notice of the hearing date or with a list of factors that may be considered. Nor does the Board demonstrate that it would be unduly burdensome to provide a brief summary of the evidence justifying the denial of parole. To be sure, these measures may cause some inconvenience, but "the Constitution recognizes higher values than speed and efficiency." *Stanley* v. *Illinois,* 405 U. S. 645, 656 (1972); accord, *Frontiero* v. *Richardson,* 411 U. S. 677, 690 (1973); *Bell* v. *Burson,* 402 U. S. 535, 540–541 (1971). Similarly lacking in the Court's analysis is any recognition of the private interest affected by the Board's action. Certainly the interest in being released from incarceration is of sufficient magnitude to have some bearing on the process due.[14]

---

[14] While the severity of a loss does not of itself establish that an interest deserves constitutional protection, this factor does weigh heavily in deter-

The second fundamental flaw in the Court's analysis is that it incorrectly evaluates the only factor actually discussed. The contribution that additional safeguards will make to reaching an accurate decision necessarily depends on the risk of error inherent in existing procedures. See *Mathews* v. *Eldridge, supra,* at 334–335, 343–347. Here, the Court finds supplemental procedures to be inappropriate because it assumes existing procedures adequately reduce the likelihood that an inmate's files will contain incorrect information which could lead to an erroneous decision. No support is cited for this assumption, and the record affords none. In fact, researchers and courts have discovered many substantial inaccuracies in inmate files, and evidence in the instant case revealed similar errors.[15] Both the District Court and the Court of Appeals

mining the procedural safeguards mandated by the Fourteenth Amendment. See *Goss* v. *Lopez,* 419 U. S. 565, 575–576 (1975); *Board of Regents* v. *Roth,* 408 U. S. 564 (1972).

[15] In this case, for example, the form notifying one inmate that parole had been denied indicated that the Board believed he should enlist in a self-improvement program at the prison. But in fact, the inmate was already participating in all such programs available. Tr. 38–39. Such errors in parole files are not unusual. *E. g., Kohlman* v. *Norton,* 380 F. Supp. 1073 (Conn. 1974) (parole denied because file erroneously indicated that applicant had used gun in committing robbery); *Leonard* v. *Mississippi State Probation and Parole Board,* 373 F. Supp. 699 (ND Miss. 1974), rev'd, 509 F. 2d 820 (CA5), cert. denied, 423 U. S. 998 (1975) (prisoner denied parole on basis of illegal disciplinary action); *In re Rodriguez,* 14 Cal. 3d 639, 537 P. 2d 384 (1975) (factually incorrect material in file led parole officers to believe that prisoner had violent tendencies and that his "family reject[ed] him"); *State* v. *Pohlabel,* 61 N. J. Super. 242, 160 A. 2d 647 (1960) (files erroneously showed that prisoner was under a life sentence in another jurisdiction); Hearings on H. R. 13118 et al. before Subcommittee No. 3 of the House Judiciary Committee, 92d Cong., 2d Sess., pt. VII–A, p. 451 (1972) (testimony of Dr. Willard Gaylin: "I have seen black men listed as white and Harvard graduates listed with borderline IQ's"); S. Singer & D. Gottfredson, Development of a Data Base for Parole Decision-Making 2–5 (NCCD Research Center, Supp. Report 1, 1973) (information provided by FBI often lists same charge six or seven times without showing a final disposition).

found additional procedures necessary to decrease the margin of error in Nebraska's parole release proceedings. Particularly since the Nebraska statutes tie the parole decision to a number of highly specific factual inquiries, see *ante,* at 16–18, I see no basis in the record for rejecting the lower courts' conclusion.

Finally, apart from avoiding the risk of actual error, this Court has stressed the importance of adopting procedures that preserve the appearance of fairness and the confidence of inmates in the decisionmaking process. THE CHIEF JUSTICE recognized in *Morrissey* that "fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness," 408 U. S., at 484 (citation omitted), a view shared by legislators, courts, the American Bar Association, and other commentators.[16] This consideration is equally significant whether liberty interests are extinguished in parole release or parole revocation proceedings. As Mr. Justice Frankfurter argued in *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S., at 171–172 (concurring opinion):

> "The validity and moral authority of a conclusion largely depend on the mode by which it was reached. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the

---

[16] See, *e. g.,* S. Rep. No. 94–369, p. 19 (1975) ("It is essential, then, that parole has both the fact and appearance of fairness to all. Nothing less is necessary for the maintenance of the integrity of our criminal justice institutions"); *United States ex rel. Johnson* v. *Chairman of New York State Board of Parole,* 500 F. 2d, at 928; *Phillips* v. *Williams,* 583 P. 2d 488, 490 (Okla. 1978), cert. pending, No. 78–1282; ABA, Standards Relating to the Legal Status of Prisoners (Tent. Draft 1977), in 14 Am. Crim. L. Rev. 377, 598 (1977); K. Davis, Discretionary Justice: A Preliminary Inquiry 126–133 (1969); Official Report of the New York State Special Commission on Attica 97, 98 (Bantam ed. 1972).

case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done."

In my judgment, the need to assure the appearance, as well as the existence, of fairness supports a requirement that the Parole Board advise inmates of the specific dates for their hearings, the criteria to be applied, and the reasons and essential facts underlying adverse decisions. For " '[o]ne can imagine nothing more cruel, inhuman, and frustrating than serving a prison term without knowledge of what will be measured and the rules determining whether one is ready for release.' " K. Davis, Discretionary Justice: A Preliminary Inquiry 132 (1969).

## B

Applying the analysis of *Morrissey* and *Mathews,* I believe substantially more procedural protection is necessary in parole release proceedings than the Court requires. The types of safeguards that should be addressed here, however, are limited by the posture of this case.[17] Thus, only three specific issues need be considered.

---

[17] In accordance with the majority opinion, *ante,* at 16 n. 8, I do not address whether the Court of Appeals was correct in holding that the Nebraska Parole Board may not abandon the procedures it already provides. These safeguards include permitting inmates to appear and present documentary support at hearings, and providing a statement of reasons when parole is denied or deferred. Because the inmates failed to seek review of the Court of Appeals' decision, I also express no view on whether it correctly held that the Board's practice of allowing inmates to present witnesses and retain counsel for final parole hearings was not constitutionally compelled. Finally, it would be inappropriate to consider the suggestion advanced here for the first time that inmates should be allowed access to their files in order to correct factual inaccuracies. Cf. *ante,* at 15 n. 7.

Nevertheless, the range of protections currently afforded does affect whether additional procedures are constitutionally compelled. The specific dictates of due process, of course, depend on what a particular situation

While the question is close, I agree with the majority that a formal hearing is not always required when an inmate first becomes eligible for discretionary parole. *Ante,* at 14–15. The Parole Board conducts an initial parole review hearing once a year for every inmate, even before the inmate is eligible for release. Although the scope of this hearing is limited, inmates are allowed to appear and present letters or statements supporting their case. If the Board concludes that an eligible inmate is a good candidate for release, it schedules a final and substantially more formal hearing.

The Court of Appeals directed the Parole Board to conduct such a formal hearing as soon as an inmate becomes eligible for parole, even where the likelihood of a favorable decision is negligible, but the court required no hearing thereafter. 576 F. 2d 1274, 1285 (CA8 1978). From a practical standpoint, this relief offers no appreciable advantage to the inmates. If the Board would not have conducted a final hearing under current procedures, inmates gain little from a requirement that such a hearing be held, since the evidence almost certainly would be insufficient to justify granting release. And because the Court of Appeals required the Board to conduct only one hearing, inmates risk losing the right to a formal proceeding at the very point additional safeguards may have a beneficial impact. The inmates' interest in this modification of the Board's procedures is thus relatively slight.[18] Yet the burden

demands. See *Cafeteria & Restaurant Workers* v. *McElroy,* 367 U. S. 886, 895 (1961). Nebraska's use of formal hearings when the possibility of granting parole is substantial and informal hearings in other cases, for example, combined with provision of a statement of reasons for adverse decisions, obviously reduces the need for supplemental procedures.

[18] Although a formal hearing at the point of initial eligibility would reduce the risk of error and enhance the appearance of fairness, providing a summary of essential evidence and reasons, see n. 25, *infra,* together with allowing inmates to appear at informal hearings, decreases the justification for requiring the Board to conduct formal hearings in every case. See n. 17, *supra.*

imposed on the Parole Board by the additional formal hearings would be substantial. Accordingly, I believe the Board's current practice of combining both formal and informal hearings is constitutionally sufficient.

However, a different conclusion is warranted with respect to the hearing notices given inmates. The Board currently informs inmates only that it will conduct an initial review or final parole hearing during a particular month within the next year. The notice does not specify the day or hour of the hearing. Instead, inmates must check a designated bulletin board each morning to see if their hearing is scheduled for that day. In addition, the Board refuses to advise inmates of the criteria relevant in parole release proceedings, despite a state statute expressly listing 14 factors the Board must consider and 4 permissible reasons for denying parole. See Neb. Rev. Stat. § 83–1,114 (1976), quoted *ante,* at 11, 16–18.

Finding these procedures insufficient, the District Court and the Court of Appeals ordered that each inmate receive written advance notice of the time set for his hearing, along with a list of factors the Board may consider. 576 F. 2d, at 1285.[19] Although the Board has proffered no justification for refusing to institute these procedures, *id.,* at 1283, the Court sets aside the relief ordered below on the ground that "[t]here is no claim that either the timing of the notice or its substance seriously prejudices the inmate's ability to prepare adequately for the hearing." *Ante,* at 14 n. 6. But respondents plainly have contended throughout this litigation that reasonable advance notice is necessary to enable them to organize their evidence, call the witnesses permitted by the Board, and notify private counsel allowed to participate in the

---

[19] The courts below found that 72 hours' advance notice ordinarily would enable prisoners to prepare for their appearances. 576 F. 2d, at 1283. The Court of Appeals further determined that the statutory criteria were sufficiently specific that the Board need only include a list of those criteria with the hearing notices or post such a list in public areas throughout the institution. *Ibid.*

hearing, see Brief for Respondents 65–66; Answer Brief for Appellee Inmates in No. 77–1889 (CA8), pp. 6, 8–9, 25, 28; Trial Brief for Inmates in Civ. 72–L–335 (Neb.), pp. 17–18; and the courts below obviously agreed. See 576 F. 2d, at 1283; Mem. Op. in Civ. 72–L–335 (Neb., Oct. 21, 1977), App. to Pet. for Cert. 25, 39, 45–47. Given the significant private interests at stake, and the importance of reasonable notice in preserving the appearance of fairness, I see no reason to depart here from this Court's longstanding recognition that adequate notice is a fundamental requirement of due process, *e. g.*, *Memphis Light, Gas & Water Division* v. *Craft,* 436 U. S. 1, 13 (1978); *Mullane* v. *Central Hanover Trust Co.,* 339 U. S. 306, 314 (1950), a principle heretofore found equally applicable in the present context. *Wolff* v. *McDonnell,* 418 U. S., at 563–564; *Gagnon* v. *Scarpelli,* 411 U. S., at 786; *Morrissey* v. *Brewer,* 408 U. S., at 486–487, 489.

Finally, I would require the Board to provide a statement of the crucial evidence on which it relies in denying parole.[20] At present, the Parole Board merely uses a form letter noting the general reasons for its decision. In ordering the Board to

---

[20] Every other Court of Appeals holding the Due Process Clause applicable to parole release proceedings has also concluded that the parole board must advise the inmates in writing of the reasons for denying parole. See *Franklin* v. *Shields,* 569 F. 2d, at 800–801 (en banc); *United States ex rel. Richerson* v. *Wolff,* 525 F. 2d 797 (CA7 1975), cert. denied, 425 U. S. 914 (1976); *Childs* v. *United States Board of Parole,* 167 U. S. App. D. C. 268, 511 F. 2d 1270 (1974); *United States ex rel. Johnson* v. *Chairman of New York State Board of Parole,* 500 F. 2d 925 (CA2), vacated as moot, 419 U. S. 1015 (1974). The parties to *Franklin* v. *Shields* did not request that the Parole Board also be required to provide a summary of the essential facts, see 569 F. 2d, at 787, 797, and the Fourth Circuit did not address the issue. The Second Circuit in *Johnson* expressly held that the statement of reasons must be supplemented by a summary of the "essential facts upon which the Board's inferences are based." 500 F. 2d, at 934. *Richerson* and *Childs* also indicated that the notice of reasons should include a description of the crucial facts. See 525 F. 2d, at 804; 511 F. 2d, at 1281–1284, aff'g 371 F. Supp. 1246, 1247 (1973).

furnish as well a summary of the essential facts underlying the denial, the Court of Appeals made clear that " 'detailed findings of fact are not required.' " 576 F. 2d, at 1284. The majority here, however, believes even this relief to be unwarranted, because it might render parole proceedings more adversary and equate unfavorable decisions with a determination of guilt. *Ante,* at 15–16.

The Court nowhere explains how these particular considerations are relevant to the inquiry required by *Morrissey* and *Mathews.* Moreover, it is difficult to believe that subsequently disclosing the factual justification for a decision will render the proceeding more adversary, especially when the Board already provides a general statement of reasons.[21] And to the extent unfavorable parole decisions resemble a determination of guilt, the Board has no legitimate interest in concealing from an inmate the conduct or failings of which he purportedly is guilty.

While requiring a summation of the essential evidence might entail some administrative inconvenience, in neither *Morrissey* v. *Brewer, supra,* at 489; *Gagnon* v. *Scarpelli, supra,* at 786; nor *Wolff* v. *McDonnell, supra,* at 563, 564–565, did the Court find that this factor justified denying a written statement of the essential evidence and the reasons underlying a decision. It simply is not unduly

> "burdensome to give reasons when reasons exist. Whenever an application . . . is denied . . . there should be some reason for the decision. It can scarcely be argued that government would be crippled by a requirement that the reason be communicated to the person most directly affected by the government's action." *Board of Regents* v. *Roth,* 408 U. S. 564, 591 (1972) (MARSHALL, J., dissenting).

---

[21] Contrary to its supposition here, in *Wolff* v. *McDonnell,* 418 U. S., at 565, the Court could perceive no "prospect of prison disruption that can flow from the requirement of these statements."

See *Mathews* v. *Eldridge,* 424 U. S., at 345–346; *SEC* v. *Chenery Corp.,* 318 U. S. 80 (1943). And an inability to provide any reasons suggests that the decision is, in fact, arbitrary.[22]

Moreover, considerations identified in *Morrissey* and *Mathews* militate in favor of requiring a statement of the essential evidence. Such a requirement would direct the Board's focus to the relevant statutory criteria and promote more careful consideration of the evidence. It would also enable inmates to detect and correct inaccuracies that could have a decisive impact.[23] And the obligation to justify a decision publicly would provide the assurance, critical to the appearance of fairness, that the Board's decision is not capricious. Finally, imposition of this obligation would afford inmates instruction on the measures needed to improve their prison behavior and prospects for parole, a consequence surely consistent with rehabilitative goals.[24] Balancing these con-

---

[22] See Hirschkop & Millemann, The Unconstitutionality of Prison Life, 55 Va. L. Rev. 795, 811–812, 839 (1969).

[23] The preprinted list of reasons for denying parole is unlikely to disclose these types of factual errors. Out of 375 inmates denied parole during a 6-month period, the only reason given 285 of them was: "Your continued correctional treatment, vocational, educational, or job assignment in the facility will substantially enhance your capacity to lead a law-abiding life when released at a later date." App. 40–42. Although the denial forms also include a list of six "[r]ecommendations for correcting deficiencies," such as "[e]xhibit some responsibility and maturity," the evidence at trial showed that all six items were checked on 370 of the 375 forms, regardless of the facts of the particular case. App. 42; Tr. 38–39, 45–46.

[24] See, *e. g.,* cases cited in n. 20, *supra; Candarini* v. *Attorney General of United States,* 369 F. Supp. 1132, 1137 (EDNY 1974); *Monks* v. *New Jersey State Parole Board,* 58 N. J. 238, 249, 277 A. 2d 193, 199 (1971); K. Davis, Discretionary Justice: A Preliminary Inquiry 126–133 (1969); M. Frankel, Criminal Sentences 40–41 (1972); Dawson, The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice, 1966 Wash. U. L. Q. 243, 302; Comment, 6 St. Mary's L. J. 478, 487 (1974).

siderations against the Board's minimal interest in avoiding this procedure, I am convinced that the Fourteenth Amendment requires the Parole Board to provide inmates a statement of the essential evidence as well as a meaningful explanation of the reasons for denying parole release.[25]

Because the Court's opinion both depreciates inmates' fundamental liberty interest in securing parole release and sanctions denial of the most rudimentary due process protection, I respectfully dissent.

---

[25] This statement of reasons and the summary of essential evidence should be provided to all inmates actually eligible for parole, whether the adverse decision is rendered following an initial review or a final parole hearing.