ACCEPTED
03-14-00586-CR
5089156
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/29/2015 4:18:44 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00586-CR

IN THE
COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
OF TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/30/2015 11:49:00 AM
JEFFREY D. KYLE
Clerk

**TERRELL MAXWELL**,
Appellant

v.

**The State of Texas,**
Appellee

On Appeal In Case Number D-1-DC-08-300490
From the 331st Judicial District Court of Travis County
The Hon. David Crain, Judge Presiding

**Brief on Appeal**

Submitted by:

The Law Offices of Jon Evans
806 West 11th Street
Austin, Texas  78701
Tel.  512/476-4075
Fax:  512/477-6840
jontevans@aol.com

**Jon Evans**
State Bar No. 00787445

Attorney for Terrell Maxwell

**Oral Argument Requested**

# Table of Contents

Identities of Parties and Counsel…………………………………………………………iii-iv

Table of Contents…………………………………………………………………………  ii

Index of Authorities………………………………………………………………..vi

Preliminary Statement of the Case……………………………………………vii

Issues Presented/Points of Error……………………………………………………ix

Statement of Facts…………………………………………………………………11

Summary of Arguments…………………………………………………………

     Issue Number One                                          23

Prayer………………………………………………………………………..33

Certificate of Service……………………………………………………………….34

Word Count Certification……………………………………………………35

## Identity of Parties

Pursuant to Rule 38.1, Rules of Appellate Procedure ("Tex.R.App.Pro."), the following is a complete list of the names and addresses of all parties to the trial court's final judgment and their counsel in the trial court, as well as appellate counsel, so that the members of the court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision of the case, and so the Clerk of the Court may properly notify the parties to the trial court's final judgment or their counsel, if any, of the judgment and all orders of the Court of Appeals.

## Identity of Parties and Counsel

**TERRELL MAXWELL**, Appellant, Robertson Unit, 12071 FM 3522, Abilene, Texas 79601

**Jon T. Evans, Attorney for Appellant on Habeas Corpus**, 806 W. 11th St., Austin, Texas, 78701, Austin, Texas 78701, phone 512.476.4075, fax 512.477.6840, email: jontevans@aol.com

**Jon T. Evans, Attorney for Appellant at Trial**, 806 W. 11th St., Austin, Texas, 78701, Austin, Texas 78701, phone 512.476.4075, fax 512.477.6840, email: jontevans@aol.com

**Jon T. Evans, Attorney for Appellant on Appeal**, 806 W. 11th St., Austin, Texas, 78701, Austin, Texas 78701, phone 512.476.4075, fax 512.477.6840, email: jontevans@aol.com

**Rosemary Lehmberg, Travis County District Attorney, Attorney for State of Texas**, PO Box 1768, Austin, Texas 78767, phone 512.854.9400

**Scott Taliaferro, Travis County Assistant District Attorney, Attorney for State of Texas on Appeal and Habeas Corpus**, PO Box 1768, Austin, Texas 78767, phone 512.854.9400

**Lisa Stewart, Travis County Assistant District Attorney, Attorney for State of Texas on Appeal and Habeas Corpus**, PO Box 1768, Austin, Texas 78767, phone 512.854.9400

**Amy Meredith, Travis County Assistant District Attorney, Attorney for State of Texas at Trial**, PO Box 1768, Austin, Texas 78767, phone 512.854.9400

**Marianne Powers, Travis County Assistant District Attorney, Attorney for State of Texas at Trial**, PO Box 1768, Austin, Texas 78767, phone 512.854.9400

**Hon. Bob Perkins, Retired Judge of the 331st Judicial District Court**, PO Box 1768, Austin, Texas 78767, phone 512.854.9443

**Hon. David Crain, Presiding Judge of the 331st Judicial District Court**, PO Box 1768, Austin, Texas 78767, phone 512.854.9443

# Index of Authorities

**Federal Cases**:

*Ex parte Henderson*, 645 S.W.2d 469 (Tex. Crim. App. 1983)  26

*Graham v. Florida*, 560 U.S. 48 (2010)  24

*Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1 (1979)  25, 29

*Johnson v. Wells*, 566 F.2d 1016 (5th Cir. 1978)  27, 31

*Long v. Briscoe*, 568 F.2d 1119 (5th Cir. 1978)  27, 31

*Miller v. Alabama*, 132 S. Ct. 2455 (2012)  *passim*

*Roper v. Simmons*, 543 U.S. 551 (2005)  29


**Constitution**

U.S. Const. Amend. VIII  31, 32

U.S. Const. Amend. XIV  31, 32

## Statutes and Rules

37 Adm. Code § 145.2                                         27

37 Adm. Code § 145.3                                         29

Tex. Gov. Code § 498.003                                     25, 26

Tex. Gov. Code § 508.141                                     27

Tex. Gov. Code § 508.144                                     27

Tex. Gov. Code § 508.149                                     25

Texas Penal Code § 8.07                                      30

Texas Penal Code § 12.31                                     iii, 22, 23

Texas R. App. Pro. § 38.01                                   vii, ix, 10

**<u>Preliminary Statement of the Case and Procedural History</u>**

Pursuant to Tex.R.App.Pro. 38.1, the following is a brief general statement of the nature of the cause or offense: Appellant, Terrell Maxwell, was charged by indictment with the offenses of Capital Murder, a capital felony, and Aggravated Robbery, a first degree felony in Cause Number D-1-DC-08-300490, in the 331st Judicial District Court of Travis County, Texas. Terrell Maxwell proceeded to trial by jury and was convicted of the offense of Capital Murder in said cause on December 11, 2008. On that same date of December 11, 2008, Terrell Maxwell was sentenced by the court to the mandatory sentence of Life in the Institutional Division of the Texas Department of Criminal Justice without the possibility of parole and a $0 fine. Notice of Appeal was timely given on December 29, 2008.

On November 12, 2010, the Third Court of Appeals affirmed the judgment and sentence of the trial court. *See* Exhibit 2; Maxwell v. State, No. 03-09-00027-CR (Tex. App. Austin, November 12, 2010) (not designated for publication).

Appellant filed a pro se Application for Writ of Habeas Corpus under Article 11 of the Texas Code of Criminal Procedure. In this original Application, Appellant raised numerous claims. Counsel filed an amendment to this application alleging **Miller v. Alabama** grounds, that the Appellant was only 17 at the time a life sentence without the possibility of parole was assessed.

On February 6, 2013, the Court of Criminal Appeals ordered that the parties submit briefs as to whether or not the United States Supreme Court decision in <u>Miller v. Alabama</u> should be applied retroactively, and what remedy would be appropriate.

On March 19, 2014, the Court of Criminal Appeals decided that the Appellant's case should be returned to the trial court for re-sentencing, and the mandate was affirmed on April 16, 2014.

The State of Texas, by and through the Travis County District Attorney's Office, decided not to seek a sentence of life without the possibility of parole, and instead asked the trial court to assess a sentence automatically for life with the possibility of parole.

Over Appellant's objections, the Court automatically assessed a life sentence with the possibility of parole on August 8, 2014.

Appellant filed a motion for new trial and notice of appeal Sept. 11, 2014.

Pursuant to Tex.R.App.Pro. 38.1, the following are the points upon which this appeal is predicated:

**Issue Number One—**

**Pursuant to the holding of the United States Supreme Court in *Miller v. Alabama*, 132 S. Ct. 2455 (2012), even a sentence of life with the possibility of parole after 40 calendar years for a juvenile violates the Eighth Amendment of the United States Constitution because: (1) Appellant was a juvenile at the time of the offense and this fact is "relevant to the Eighth Amendment," (2) the Eighth Amendment requires trial courts to consider youth as a mitigating factor when sentencing a juvenile to life in prison, and (3) in Texas, a sentence of life in prison with the possibility of parole after 40 years amounts to a *de facto* life sentence. As a result, Appellant is entitled to a new trial.**

No. 03-14-00586-CR

IN THE
COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
OF TEXAS

**Terrell Maxwell**,
Appellant

v.

**The State of Texas,**
Appellee

On Appeal From Cause Number D-1-DC-08-300490
From the 331st Judicial District Court of Travis County, Texas
The Hon. David Crain, Judge Presiding

**<u>Brief on Appeal</u>**

TO THE HONORABLE JUDGES OF THE COURT OF APPEALS:

COMES NOW, TERRELL MAXWELL, Appellant in the above styled and numbered cause, by and through Jon Evans, undersigned attorney of record, and respectfully files this "Brief on Appeal," filed pursuant to Tex.R.App.Pro. 38.1, and would show the Court as follows:

## Statement of Facts Relevant to Appeal

The Appellant, Terrell Maxwell, was charged in this cause with Capital Murder, a capital felony on February 26, 2008. (C.R.I: 03-07). The Appellant was arrested for this offense on February 28, 2008. (C.R.I: 10-11). The Defendant was indicted for one count of Capital Murder and a second count of Aggravated Robbery that occurred on or about December 15, 2007. (C.R.I: 18-000020). The Defendant was appointed counsel Jon Evans on March 3, 2008. (C.R.I: 16).

The Defendant was arraigned on a plea of not guilty to the offense of Capital Murder on December 8, 2008. (C.R.: 000104-105; R.R.III: 6). The State of Texas waived the second count of the indictment of Aggravated Robbery on December 8, 2008. (R.R.III: 6-7). The Defendant entered a plea of not guilty (R.R.IV: 5). The Appellant was tried on the issue of guilt/innocence by a jury on December 8-11, 2008.

Austin Police Department Officer Ronald Ruiz was dispatched to 1620 Rutland Boulevard, which was an apartment complex, in the early morning hours on December 15, 2007. (R.R. IV: 12). Officer Ruiz encountered two Hispanic men in the parking lot who directed him to a van parked there. (R.R. IV: 14-15). The dispatch had been for a shooting in a van. (R.R. IV: 15). Officer Ruiz found a man in a van with no pulse, who, due to his apparent injuries, was obviously dead. (R.R. IV: 16). Officer Ruiz testified that the people

11

who had called the police had said they had found the man in this state in the van. (R.R. IV: 21).

The next witness, Juan Garcia Nieto, testified that a man named Fernando Santander had worked for him. (R.R. IV: 29). Nieto said that Fernando Santander drove a white van that Nieto owned while Santander worked for him. (R.R. IV: 30). Nieto told the jury that he had last seen Santander on the night of December 14, 2007, and that Santander was alive at the time. (R.R. IV: 32). On December 15, 2007, Nieto received a call from the Austin Police Department to come to the apartment complex on Rutland Avenue. (R.R. IV: 32). Nieto testified that upon arrival he saw Santander dead in his van (R.R. IV: 33), and said he recognized Santander because he had been wearing the same shirt earlier in the evening. (R.R. IV: 34).

Austin Police Department Detective Mark Gilchrest testified that he coordinated some witness interviews (R.R. IV: 29), as well as the taking of photos of the crime scene. (R.R. IV: 46). Police Department personnel recovered a bullet fragment in the parking lot of the apartment complex. (R.R. IV: 47). Detective Gilchrest testified that the physical evidence from the scene indicated that the shooter had been standing between the door of the van and the car door opening when Santander was shot in the head. (R.R. IV: 57-58). The identification of Santander was recovered from his person along with $369. (R.R. IV: 71). Detective Gilchrest opined that this was a "contact wound," (R.R. IV: 81), and that the wound was consistent with the shooter having been slightly lower than the position of the victim.

(R.R. IV: 83). Detective Gilchrest stated that the lead core that was recovered was consistent with a larger caliber firearm. (R.R. IV: 91). All areas of the van were dusted for fingerprints. (R.R. IV: 91). However, Detective Gilchrest did admit that no one conducted tests with knitting rods, sticks or other means to determine the actual trajectory of the gunshot. (R.R. IV: 103).

Austin Police Department Detective Kerry Scanlon testified that the victim was formally identified as Fernando Santander. (R.R. IV: 115). He testified that after having no leads for some time after the death of Santander, a tip came in on the case on January 20, 2008. (R.R. IV: 121). The tipster supposedly used to date one of the suspect's mothers, and proceeded to give three names. (R.R. IV: 123). The tipster gave nicknames which lead to the suspects Rashad Dukes, Michael Jamerson and Terrell Maxwell. (R.R. IV: 125). Scanlon met with the tipster and showed him a photo lineup that included Rashad Dukes. (R.R. IV: 126). The officers lined up an opportunity to detain all three suspects at the same time. (R.R. IV: 127). Tiffany Kyles, the girlfriend of Michael Jamerson, was interviewed, as was Tawanna Eaglin, the girlfriend of Rashad Dukes, as was Sharyda Jamerson, the girlfriend of the Appellant Terrell Maxwell (Sharyda Jamerson was also the sister of Michael Jamerson). (R.R. IV: 130). The officers were not successful in interviewing the Appellant Maxwell. (R.R. IV: 131). There was information that a Blue Geo Prizm, which was used by Michael and Sharyda Jamerson, might be involved in this offense. (R.R. IV: 131). Inside of the Geo Prizm, a box of .44 caliber ammunition was found, (R.R. IV: 135), and twelve (12) rounds

13

were found to be missing from the box. (R.R. IV: 136). Also, inside of the Geo Prizm, a possible blood stain was located. (R.R. IV: 134). Officer Scanlon requested both DNA and fingerprint testing of the bullets found in the car, as well as fingerprinting of the victim's van. (R.R. IV: 136-137). Officer Scanlon stated that the Appellant is shorter than his co-defendants, Dukes and Jamerson. (R.R. IV: 138). Officer Scanlon also requested that a section of the dashboard of the Geo Prizm be cut out so that DNA testing could be conducted on the stain. (R.R. IV: 145).

Israel Tovar Terrazas testified that he was a roommate of the victim Fernando Santander, (R.R. IV: 157), and that he last saw him alive on the night of December 14, 2007. (R.R. IV: 158-159). Terrazas stated that he arrived home at around 5:20 A.M. and saw a van parked in the parking lot that was still turned on, and that Fernando was in the van. (R.R. IV: 160-161). Terrazas went and retrieved his other roommate David from inside of their apartment. (R.R. IV: 164). They could see that Santander was shot in the head. (R.R. IV: 166). Terrazas called 911. (R.R. IV: 169).

Michael Jamerson testified that he grew up with Rashad Dukes, and that he met the Appellant in Middle School. (R.R. IV: 186). He testified that he lived with this sister, Sharyda Jamerson, the Appellant, Rashad Dukes, Tawanna Eaglin, and Tiffany Kyles on Golden Meadow Street. (R.R. IV: 188-189). On the night of December 14, 2007, he said that they were all in the apartment they shard, smoking (marijuana) and watching a movie. (R.R. IV: 189). He said that they decided to "go hit a lick," to get some money, around 1 or 2 A.M., and

14

said that "it was Rashad and Terrell's idea." (R.R. IV: 190). Jamerson said that their intent was to rob a dope (drug) dealer. (R.R. IV: 191). Jamerson further stated that he was driving, that the Appellant was the passenger and that Rashad was behind him. (R.R. IV: 192). Jamerson said that the Appellant "had a big revolver." (R.R. IV: 192). Jamerson said that the Appellant gave directions to go to the apartment complex with dope dealers and Mexicans. (R.R. IV: 194). Michael Jamerson testified that he backed into a parking spot. (R.R. IV: 195). Jamerson also said that the Appellant told them that "if the dude didn't give him the money, he was going to bust," and that "bust" (in this context) meant "to shoot." (R.R. IV: 196). Jamerson further stated that the Appellant and Dukes got out of the car first and started walking around the apartment complex, and that he saw the gun drawn and the Appellant standing in the driver's doorway of the van. (R.R. IV: 197-199). Jamerson said that the Appellant had the gun pointed towards the victim's head, Dukes was on the passenger side, and that Jamerson walked up next to the Appellant. (R.R. IV: 200-201). Jamerson said that when he walked up, the gun went off, and that he had not heard any words exchanged beforehand. (R.R.IV: 201). Jamerson testified that "stuff" got on him, and that they took off running, (R.R.IV: 202), and that they went back to the apartment. (R.R.IV: 206). When they arrived back at the apartment, Jamerson went to the sliding glass door to the bedroom and had his girlfriend wake up and let him into the apartment, and that he went to the front door to let in Dukes and the Appellant, after which they all began to curse, yell and scream. (R.R.IV: 207). According to Jamerson, the Appellant said he didn't mean to do this and that it was an

15

accident. (R.R.IV: 208). According to Jamerson, he gave the Appellant his clothes, and got into the shower with his girlfriend Tiffany Kyles. (R.R.IV: 208). Jamerson reported that he broke down while in the shower with Kyles, and that when he got out, the Appellant had left, with Dukes telling him that the Appellant had taken a taxi. (R.R.IV: 209). According to Jamerson, his sister, Sharyda Jamerson was not present that night. (R.R.IV: 220). Jamerson admitted that upon first being questioned by the police, he told several lies. (R.R.IV: 225-226). Jamerson testified that the Appellant had said it was an accident and that he didn't mean to do it. (R.R.V: 13-14). Jamerson said that didn't know if Dukes intended it. (R.R.V: 14). Jamerson testified that he was familiar with .44 caliber ammunition (R.R.V: 14) and that the Appellant had a "cowboy looking" gun. (R.R.V: 28). Jamerson related that he was on Texas Youth Commission parole for aggravated assault with a deadly weapon. (R.R.V: 25). Jamerson did not know what happened to the gun. (R.R.V: 34), and he related that he believed it was an accident. (R.R.V: 36). Jamerson then changed his testimony to say that looking back he can't say it was an accident that night (R.R.V: 37), but that the Appellant said it was an accident (R.R.V: 39), as he was crying and saying he was sorry. (R.R.V: 40).

Lafayette Davis was cab driver on duty on December 15, 2007, and he was called to pick up a fare named Jonathan around 3 A.M. He did not remember anything about the person nor could identify the person. (R.R.VI: 109-112).

James Bixler, an Austin Police Department crime scene specialist testified, as did William Welch, another senior crime scene specialist from the Austin police Department.

16

Also Pat Bui, who at the time of the offense was an Austin police Department crime scene specialist, testified.

Dr. David Dolinak, the Medical Examiner for Travis County, Texas, testified that the wound to Fernando Santander was a contact gunshot wound (R.R.VI: 169), that Santander died as the result of the gunshot wound, and that the cause of death was homicide. (R.R.VI: 180-181).

Cassie Carridine, DNA examiner for the Austin Police Department, testified that the Appellant was excluded as a contributor to the DNA found on the ammunition. (R.R.VI: 197).

Charles Parker, fingerprint examiner for the Austin Police Department, testified that fingerprints were lifted from the decedent's van (R.R.VI: 205-206), but that there was no match of the Appellant. (R.R.VI: 212).

Tiffany Kyles testified that she was dating Michael Jamerson and living in an apartment on Golden Meadow with Jamerson, Rashad Dukes, Tawanna Eaglin, Sharyda Jamerson and the Appellant for a total of about 2 ½ months, (which included the night in question). (R.R.VI: 53). Kyles had been smoking pot with Tawanna Eaglin and was high. (R.R.VI: 54). Jamerson had a concert that night. (R.R.VI: 55). Kyles woke up to some loud banging, and she had no idea what time it was, and Jamerson was crying. (R.R.VI: 55-56). She says "I know he was talking to the Appellant." (R.R.VI: 56). Kyles had no idea what

happened to Jamerson's clothes. (R.R.VI: 59). Jamerson told her that they were going to rob someone. (R.R.VI: 60, 75-76). Kyles testified that the Appellant carried a "cowboy gun". (R.R.VI: 6). Kyles said that she had seen the Appellant put the gun on top of the refrigerator "a week or two, I'm not sure" before the incident, and that everybody knew where the gun was (R.R.VI: 7). Kyles said she had seen the Appellant with a "cowboy gun" prior to the incident. (Note: she did not give a time frame). (R.R.VI: 13).

Rashad Dukes testified that he met both the Appellant and Jamerson a long time ago when they were in school together, (R.R.VI: 22-23), and that they hooked back up together when Dukes got out of the Texas Youth Commission. (R.R.VI: 24). Dukes said they were all hanging out at the apartment when they decided to go rob someone. (R.R.VI: 29). Dukes said Jamerson was driving, the Appellant was the front passenger and Dukes was in back. (R.R.VI: 30). Dukes said they spotted a man in a van, and that the Appellant had a little pistol, (R.R.VI: 31), and it was like a "cowboy gun," (R.R.VI: 32), a revolver. (R.R.VI: 35). Dukes admitted to lying to the police. (R.R.VI: 36). Dukes testified that the Appellant had said that the next person who doesn't give him their money he is going to shoot. (R.R.VI: 37). According to Dukes, the plan was that Dukes was actually going to take the money. (R.R.VI: 37).Dukes said he heard the Appellant say to the man to give him his money and then heard a shot and that the man had been shot in the head. (R.R.VI: 42-44). According to Dukes, the appellant said it was an accident (R.R.VI: 45), and that he was going to call a cab. (R.R.VI: 51). Dukes admitted to telling many lies to the police in order to keep himself and Jamerson

18

out of trouble. (R.R.VI: 59-61). Dukes testified that he thinks the Appellant meant to do it. (R.R.VI: 75). Dukes also said that the Appellant supposedly sold the gun. (R.R.VI: 75). Dukes admitted to previously telling his girlfriend Tawana Eaglin that the gunshot was accidental. (R.R.VI: 78).

Tawanna Eaglin testified that she dated Rashad (Dukes), and that she knew Jamerson through Rashad (Dukes). (R.R.VI: 80-81). On the night of the incident, Eaglin testified that she was at the apartment, watching movies, listening to music and "chilling." (R.R.VI: 84-85). She stated that the three men left, and she didn't know where they were going or for how long they were to be gone. (R.R.VI: 85). Later, she was awakened by Dukes, who had her come into the living room. (R.R.VI: 86-87). Dukes told her they tried to rob "a Mexican dude," the gun went off, and the guy was shot. (R.R.VI: 88). Dukes told her that the Appellant had the gun and it went off accidentally. (R.R.VI: 89). Eaglin never saw the Appellant with a gun. (R.R.VI: 91). Eaglin testified that she saw the Appellant earlier in the evening but did not when Dukes and Jamerson returned to the apartment. (R.R.VI: 98-100). She stated, "He wasn't there." (R.R.VI: 101).

Travis County District Attorney's Investigator Anthony Johnson testified regarding the efforts undertaken to attempt to gain service and attendance at trial of two witnesses, Shryda Jamerson and Juan Gonzalez (R.R.VII: 7-17). Also, Austin Police Department Officer Jeff Crawford testified regarding his efforts to find the witness Juan Gonzalez. (R.R.VII: 21).

Greg Karim, the firearms and tool mark examiner for the Austin Police Department testified. (R.R.VII: 24). Karim said that the slug found in the parking lot/ scene of the crime, was consistent with a .44 caliber slug, and that the .44 caliber ammunition found is consistent with the slug found. (R.R.VII: 59). Karim said that no firearm was ever submitted to him, (R.R.VII: 60), and that he cannot tell amount of pressure used to fire the gun, nor can he determine who fired the gun. (R.R.VII: 61).

Outside of the presence of the jury a long discussion was held regarding an extraneous offense which the State wished to put on. Defense Counsel objected on Texas Rules of Evidence grounds, T.R.E. 401, 403 and 404 (b), as well as on grounds that the extraneous was too remote in time as to be relevant. Counsel's objections were overruled and a running objection was granted as to the testimony of the next two witnesses. (R.R.VII: 62-72).

Anthony Lovingood testified that on December 9, 2007, Rashad Dukes showed up at his apartment. (R.R.VII: 75). Lovingood went on to describe a robbery, and identified the Appellant as being one of the two men involved. (R.R.VII: 77-89). Rachel Sullivan testified as to the same events of December 9, 2007, describing waking up to loud noises, seeing a person she knew as Rashad Dukes, and detailing a robbery. (R.R.VII: 99-105). (It should be noted that she did not describe a gun.)

The Defendant, Terrell Maxwell, chose not to testify (R.R. VII: 117-118).

The jury found the Appellant, Terrell Maxwell, guilty of Capital Murder as alleged in the indictment. (R.R.VII: 165).

20

The Defendant had elected for the jury to assess punishment (C.R.I: 101-102). At the sentencing phase of the trial, the Court imposed an automatic life sentence without parole for the Defendant, Terrell Maxwell, (as the State could not seek the death penalty under the law, as the Defendant was 17 at the time of the incident) (R.R.VII: 168).

The Appellant filed his Notice of Appeal on December 29, 2008, (C.R.I: 135-137) and the Court certified his right to appeal. (C.R.I:142-143).

On November 12, 2010, the Third Court of Appeals affirmed the judgment and sentence of the trial court. *See* Exhibit 2; Maxwell v. State, No. 03-09-00027-CR (Tex. App. Austin, November 12, 2010) (not designated for publication).

Appellant filed a pro se Application for Writ of Habeas Corpus under Article 11 of the Texas Code of Criminal Procedure. In this original Application, Appellant raised numerous claims. Counsel filed an amendment to this application alleging **Miller v. Alabama** grounds, that the Appellant was only 17 at the time a life sentence without the possibility of parole was assessed.

On February 6, 2013, the Court of Criminal Appeals ordered that the parties submit briefs as to whether or not the United States Supreme Court decision in Miller v. Alabama should be applied retroactively, and what remedy would be appropriate.

On March 19, 2014, the Court of Criminal Appeals decided that the Appellant's case should be returned to the trial court for re-sentencing, and the mandate was affirmed on April 16, 2014.

At the time of re-sentencing, the State of Texas, by and through the Travis County District Attorney's Office, decided not to seek a sentence of life without the possibility of parole, and instead asked the trial court to assess a sentence automatically for life with the possibility of parole. (C.R.Supp.5).

Over Appellant's objections, the Court automatically assessed a life sentence with the possibility of parole on August 8, 2014. (C.R.Supp.9).

Counsel's objections were based on the points that (1) there is no appropriate sentencing scheme for a person 17 years of age charge with capital murder when that capital murder occurred between 2005 and 2013, pursuant to Tex.Pen.Code 12.31; (2) A life sentence even with the possibility of parole after 40 years constitutes a cruel and unusual punishment for a 17 year old pursuant to the 8th Amendment to the United States Constitution and in violation of Miller v. Alabama; (C.R.Supp. 4-9)

## ISSUE NUMBER ONE

**With regard to a proposed remedy regarding appropriate punishment, pursuant to the holding of the United States Supreme Court in *Miller v. Alabama*, 132 S. Ct. 2455 (2012), even a sentence of life with the possibility of parole after 40 calendar years for a juvenile violates the Eighth Amendment of the United States Constitution because: (1) Appellant was a juvenile at the time of the offense and this fact is "relevant to the Eighth Amendment," (2) the Eighth Amendment requires trial courts to consider youth as a mitigating factor when sentencing a juvenile to life in prison, and (3) in Texas, a sentence of life in prison with the possibility of parole after 40 years amounts to a *de facto* life sentence. As a result, in light of this State's system and its failure to consider the mitigating factors set forth in Miller v. Alabama, the Appellant is entitled to a new punishment hearing with a structure that does take into account the mitigating factors addressed in Miller v. Alabama.**

**1. Legal Argument**

**A. Introduction**

**  *Miller v. Alabama* invalidated Texas Penal Code § 12.31(a)(2).**

**  The Appellant contends that *any* sentencing scheme for juveniles that takes sentencing discretion away from juries and the courts violates the holding of *Miller v. Alabama*. Such a scheme, even if it purports to make parole possible after 40 calendar years, fails to consider the "three significant gaps between juveniles and adults" that the Supreme Court has identified in *Miller v. Alabama*: that (1) juveniles have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking; (2) juveniles are "more vulnerable…to negative influences and outside pressures," including from family and peers, have limited "control over their own environment," and "lack the ability to extricate themselves from horrific, crime-producing settings," and (3) a child's character is not as "well-formed" as an adult's, his traits are "less fixed," and his**

actions less likely to be "evidence of irretrievabl[e] deprav[ity]." See *Miller v. Alabama*, *Id*. at 2458.

Such a "one-size-fits-all" sentencing scheme of juveniles convicted of serious offenses also "..precludes consideration of [the juvenile's] chronological age and its hallmark features--among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him--and from which he cannot usually extricate himself--no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth--for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. *See, e.g.*, *Graham v. Florida*, 130 S. Ct. at 2032. As a result, as the following analysis will show, the sentencing of juveniles should be left to the discretion of juries and the courts, as juries and the courts are best-positioned to consider the individual circumstances and maturity level of the juvenile.

**B. The Texas Board of Pardons and Paroles is under no obligation to release Appellant and others situated like him after 40 calendar years or at any time thereafter.**

Merely because Appellant may become eligible for parole after serving 40 calendar years does not guarantee that the parole board will grant parole. The Texas Board of Pardons and Paroles has the *sole discretion* to grant parole after Appellant

24

becomes eligible for parole. *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7-8 (1979) (Because parole is discretionary, a state inmate has no constitutional entitlement to due process on an expectation of parole).

Further, Appellant is not eligible for mandatory release supervision. Because there was a deadly weapon finding in his conviction, *See* Exhibit 1, (CR, 132), Appellant is *permanently* ineligible for release on mandatory supervision. Tex. Gov. Code § 508.149(a). As a result, Appellant must be either released on regular parole on or after serving 40 calendar years, or must simply serve his entire sentence, which means Appellant will die in prison. *Id*.

**C. There is effectively no difference between the mandatory sentencing scheme struck down in *Miller v. Alabama* and a sentencing scheme of automatic life in prison with the possibility of parole after 40 years.**

The only difference between the mandatory sentencing scheme such as Texas Penal Code § 12.31(a)(2), which was struck down in *Miller v. Alabama*, and a mandatory sentencing scheme where a juvenile is automatically sentenced to life in prison with the possibility of parole after 40 calendar years is simply that the juvenile is *eligible* for parole consideration after 40 calendar years. This remote possibility of parole does not remedy the unconstitutionality of a sentencing scheme under which a juvenile may be condemned to life in prison without any judicial consideration of the mitigating effects of youth. Further, as explained above, the Texas Board of Pardons and Paroles is under no obligation to release the child no matter what evidence is presented 40 years later, and such a parole board hearing does not protect a juvenile against the type of cruel and unusual punishment in the way a jury or court must due to the ruling in *Miller v. Alabama*.

The parole system in Texas does not require the Board of Pardons and Paroles to consider Appellant's age at the time of the offense as a mitigating factor. Nor does the system in Texas require the Board to consider any of the other factors listed in *Miller v. Alabama*, which include the extent of his or her culpability, the juvenile's capacity for change, the circumstances of the crime, extent of the juvenile's participation in the crime, the juvenile's environment in which he or she grew up, including those of his or her family, home, and his or her neighborhood, the juvenile's emotional maturity and development, criminal history, peer pressure, any history of drugs or alcohol, the juvenile's mental health history, and any potential for rehabilitation. *See Miller v. Alabama*, *Id*. at 2458.

Rather, Appellant will be reviewed by the Board at age 57, when the weight of the evidence of the *Miller* factors may be diminished or simply unavailable. First, aside from never being eligible for mandatory release supervision, Appellant is not eligible for any good-conduct time. Normally, the director of the prison institution may grant good conduct time to an inmate who accrues good time on the following basis: twenty days for each 30 days actually served while classified as a Class I inmate or a trusty, and ten days for each 30 days actually served while classified as a Class II inmate. Tex. Gov. Code. § 498.003(b). The problem for inmates such as Appellant is that good-conduct time does not reduce his sentence, but merely applies only to eligibility for parole or mandatory release supervision. Tex. Gov. Code. § 498.003(a); *Ex parte Henderson*, 645 S.W.2d 469, 472 (Tex. Crim. App. 1983). Because Appellant is not eligible for mandatory release supervision or even parole until he serves 40 calendar years, there is no such thing as good-conduct time accruing for Appellant.

Next, before recommending parole, the Parole Panel, representing the Board

of Pardons and Paroles Division, must be satisfied that Appellant will not only support himself, outside prison but will also fulfill the obligations of a law-abiding citizen. Tex. Gov. Code § 508.141(e). The Board is authorized to release Appellant only if it determines that Appellant's release is in the best interest of society. Tex. Gov. Code § 508.141(f).

Other than these speculative and vague standards, the only statutory rule concerning the criteria for granting parole is that the Board must develop and implement "standard parole guidelines" for making parole decisions. Tex. Gov. Code § 508.144(a). Despite this statue, the Board's rules permit "complete discretion" to grant or deny parole. See 37 Adm. Code § 145.2(a). Standard, but nonexclusive, criteria on which parole decisions are made include the inmate's current offense or offenses, the amount of time the inmate has served and his institutional adjustment, and the inmate's criminal history 37 Adm. C. § 145.2(b)(2).

And the primary factor considered by the Board in making parole decisions is the inmate's prior criminal record. *See* 37 Adm. C. § 145.2(b)(2)(E); *Long v. Briscoe*, 568 F.2d 1119, 1120 (5th Cir. 1978); *Johnson v. Wells*, 566 F.2d 1016, 1017-1018 (5th Cir. 1978). In fact, the 2012 Parole Guidelines Annual Report of the Texas Board of Pardons and Paroles makes clear that when calculating the risk assessment of a potential parolee, Capital Murder causes the highest score in the offense severity class. *See* Exhibit 8, page 6, Annual Report, which can also be found at:
http://www.tdcj.state.tx.us/bpp/publications/FY%202012_ParoleGuidelinesAR.pdf
In fact, as the Annual Report shows, none of the *Miller v. Alabama* factors are relevant to the Parole Board's consideration of a juvenile.

Page 6 of the Annual Report (See Exhibit 8) clearly shows that the "Static

Factors" used by the Parole Board, which come from the inmate's prior criminal record and do not change over time, are the inmate's age at first commitment to a juvenile or adult correctional facility, history of supervisory release revocations for felony offenses, prior incarcerations, employment history, and the commitment offense. When the commitment offense is Capital Murder, which causes the highest score in the offense severity class, the "Static Factor" in considering the risk assessment is going to be astronomically high.

Next, the "Dynamic Factors" used by the Parole Board (*See* Exhibit 8, page 6), reflect characteristics the inmate has demonstrated since *being incarcerated*, and may change over time. These dynamic factors include the inmate's current age, whether he is a "confirmed security threat group (gang) member," he education, his vocational and certified on-the-job training programs completed during the present incarceration, his prison disciplinary conduct, and his current prison custody level.

As the Parole Guidelines Score chart shows (*See* Exhibit 8, page 7), Capital Murder will cause the highest guideline level score. And during the last fiscal year, those in Appellant's guideline level were approved at a rate of 13%, with 109 cases approved for parole out of 841 cases considered. *See* Exhibit 8, page 8. And this 13% includes all types of cases that create the highest guideline level score, and not just Capital Murder.

Other than this criteria, the Board may also consider the inmate's personality, the adequacy of the inmate's proposed release plan, his attitude toward the future and ability to earn a living outside of prison, his family status and whether there are family members and others in the community with whom the prisoner will be able to form constructive associations, the type of residence and community in which the prisoner intends to live, his history of excessive use of alcohol or narcotics, his mental

28

and physical condition, his conduct in prison, and "any other factors that the Board may consider relevant to a particular case." *See* 37 Adm. C. § 145.3(2); 37 Adm. C. § 145.2(b); *See also Greenholtz v. Nebraska Penal Inmates*, 442 U.S. at 11-18.

Missing from these parole requirements is any requirement that an inmate's juvenile status *at the time of the crime*, even if considered, must be deemed mitigating. In *Roper*, 543 U.S. at 573, the Supreme Court opined that this problem may be addressed by implementing rules designed to guarantee that the jury or court give proper effect to "the mitigating force of youth." *Id*.

*Miller v. Alabama* puts in place a rule addressing the Eighth Amendment issue, requiring those deciding a juvenile's sentence "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 132 S. Ct. at 2469; 2467-2468 (Age must be treated as a mitigating factor "when a juvenile confronts a sentence of life and death in prison).

Also missing from the criteria and factors used by the Parole Board are any of the factors listed in *Miller v. Alabama*, which include the extent of his or her culpability, the juvenile's capacity for change, the circumstances of the crime, extent of the juvenile's participation in the crime, the juvenile's environment in which he or she grew up, including those of his or her family, home, and his or her neighborhood, the juvenile's emotional maturity and development, criminal history, peer pressure, any history of drugs or alcohol, the juvenile's mental health history, and any potential for rehabilitation. *See Miller v. Alabama*, *Id*. at 2458.

It is clear from *Miller v. Alabama* that the *timing* of the required discretionary, individualized, youth-specific consideration is constitutionally significant. 132 S.Ct. at 2474. As a result, a determination of these factors approximately *40 years* after the date of sentence will not substitute for judicial discretion at the sentencing

hearing, which occurs immediately following conviction.

The Supreme Court held that even judicial discretion at the transfer stage could not rescue the constitutionality of a statutory scheme imposing automatic life imprisonment on juveniles: "the question at transfer hearings may differ dramatically from the issue at a posttrial sentencing. Because many juvenile systems require that the offender be released at a particular age or after a certain number of years, transfer decisions often present a choice between extremes: light punishment as a child or standard sentencing as an adult (here, life without parole)." 132 S.Ct. at 2474. The Supreme Court pointed out that many States use mandatory transfer systems, and a juvenile of a certain age who has committed a specified offense will be tried in adult court, regardless of any individualized circumstances. *Id*. In Texas, a juvenile who is 17 years of age is considered an "adult" for all purposes pertaining to the Texas Penal Code. Tex. Pen. Code § 8.07. The Supreme Court also showed that numerous states allow the decision of whether to transfer a juvenile under the age of 17 exclusively in the hands of prosecutors, with no statutory mechanism for judicial reevaluation. *Miller*, *Id*. at 2474.

In addition, the Supreme Court noted that "although later mental evaluation as an adult affords some semblance of procedural due process, it is, in effect, too little, too late," in the context of disapproval that defendant was not granted funds for a mental health expert for his transfer hearing. *Id*. at 2462 n.3.

Finally, the Parole Board members are not members of the judicial branch, and sentencing is solely a judicial function. *Miller v. Alabama* made it clear that those "meting out punishment" must consider a juvenile's "lessened culpability" and greater capacity for change." *Id*. at 2460. While a jury or trial court under the *Miller v. Alabama* rule must consider all the factors listed by the Supreme Court,

which include the extent of his or her culpability, the juvenile's capacity for change, the circumstances of the crime, extent of the juvenile's participation in the crime, the juvenile's environment in which he or she grew up, including those of his or her family, home, and his or her neighborhood, the juvenile's emotional maturity and development, criminal history, peer pressure, any history of drugs or alcohol, the juvenile's mental health history, and any potential for rehabilitation, *See Miller v. Alabama*, *Id*. at 2458, the Texas Board of Pardons and Paroles, as an extension of the Texas governor's office, has only one real consideration: whether the inmate's release will endanger the public. And because one of the primary criteria considered by the Board in making parole decisions is the inmate's prior criminal record, *See* 37 Adm. C. § 145.2(b)(2)(E); *Long v. Briscoe*, 568 F.2d at 1120; *Johnson v. Wells*, 566 F.2d at 1017-1018, when the inmate is in prison for Capital Murder, it is not overly speculative to conclude that there is effectively no difference between the mandatory sentencing scheme struck down in *Miller* and a sentencing scheme of automatic life in prison with the possibility of parole after 40 years.

As a result, a *mandatory* life sentence that leaves the possibility of release after 40 years *solely* in the hands of the Board cannot satisfy the absolute prohibition on "making youth and all that accompanies it irrelevant to the imposition of that harshest prison sentence." *Id*. at 2469. The Texas Board of Pardons and Paroles has no prohibition as what *Miller v. Alabama* imposes upon courts, and even if there was such a prohibition, because the decision to parole an inmate is at the sole discretion of the Parole Board, there is no judicial mechanism for the prohibition's enforcement. Therefore, a *mandatory* life sentence that leaves the possibility of release after 40 years under such a scheme is a *de facto* life sentence and would continue to be a violation of the Appellant's rights pursuant to the both the 8th and

31

**14th** amendments to the United States Constitution.

*In cases where the court imposes a sentence of life imprisonment, a numeric value is necessary to include these cases in any sentence length analysis. Accordingly, life sentences are reported as 470 months, a length consistent with the average life expectancy of federal criminal offenders given the average age of federal offenders. Also, sentences of greater than 470 months are also reported as 470 months for some analyses. The footnote in the relevant tables and figures indicates when this occurs. United States v. Nelson*

**2. Conclusion**

     **Pursuant to the holding in *Miller v. Alabama*, even a sentence of life with the possibility of parole after 40 calendar years for a juvenile violates the Eighth Amendment of the United States Constitution because: (1) Appellant was a juvenile at the time of the offense and this fact is "relevant to the Eighth Amendment," (2) the Eighth Amendment requires trial courts to consider youth as a mitigating factor when sentencing a juvenile to life in prison, and (3) in Texas, a sentence of life in prison with the possibility of parole after 40 years amounts to a *de facto* life sentence.**

     **As a result, Appellant prays that this court grant the relief requested, and that a new trial be held.**

## Prayer

WHEREFORE, PREMISES CONSIDERED, TERRELL MAXWELL, Appellant in the above styled and numbered cause respectfully prays that this Court find his sentence as well as his conviction to be in error, and that this Court reverse his conviction and remand to the trial court for a new trial. The Appellant prays for all other general relief to which he may be entitled.

Respectfully submitted,

**JON EVANS**
Attorney at Law
806 W. 11TH ST.
Austin, Texas  78701
Tel.  512/476-4075
Fax: 512/477-6840

by:
/S/ JON EVANS
**JON EVANS**
State Bar No. 00787445

Attorney for TERRELL MAXWELL

## Statement Regarding Oral Argument

Oral Argument is Requested.

## Certificate of Service

This is to certify that a true and correct copy of the above and foregoing "Appellant's Brief on Appeal" was hand-delivered to the office of the District Attorney of Travis County, Texas; and to Appellant at the address listed in the Certificate of Parties, on the 28th day of April, 2015.

/s/ JON EVANS ……………………………………

**JON EVANS**

## WORD COUNT CERTIFICATION

       I DO HEREBY CERTIFY THAT THE WORD COUNT FOR THIS DOCUMENT IS EXACTLY 7635 WORDS.

                    /s/ Jon Evans_____.
                    JON EVANS