IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 42650-2014

STATE OF IDAHO,

      Plaintiff-Respondent,

v.

DARRIEN MARSHALL DABNEY,

      Defendant-Appellant.

Boise, January 2016 Term

2016 Opinion No. 19

Filed: February 29, 2016

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. Hon. Cheri C. Copsey, District Judge.

The judgment and orders of the district court are affirmed.

Maya P. Waldron, Deputy State Appellate Public Defender, Boise, argued for Appellant.

Mark W. Olson, Deputy Attorney General, Boise, argued for Respondent.

EISMANN, Justice.

This is an appeal out of Ada County challenging the sentence pronounced for a developmentally disabled defendant who sexually abused a six-year-old boy; the court's order relinquishing jurisdiction after a period of retained jurisdiction because there was no community-based facility that could provide appropriate treatment for the defendant and security for the protection of the community; and the court's order denying a motion to reduce the sentence. We affirm.

## I.
## Factual Background.

Darrien Dabney ("Defendant") forcibly sodomized two six-year-old boys. At the time, Defendant was a developmentally disabled eighteen-year-old and had been living with the boys' family less than a month. He had previously resided in foster care in Virginia.

Defendant was indicted for two counts of lewd conduct, a felony. He ultimately pled guilty to one count pursuant to a plea agreement. The terms of the plea agreement included that: (1) the State would dismiss the other count; (2) the State would recommend a sentence of twenty years with five years fixed and the remaining fifteen years indeterminate; and (3) the State would recommend that the sentence be suspended and the Defendant placed on probation within a secure residential center for mentally delayed adults. The plea agreement also provided that Defendant would pay certain costs and restitution and provide the presentence investigator with the results of a psychosexual evaluation of Defendant.

At the sentencing hearing on October 9, 2013, the State recommended that the district court retain jurisdiction because it could not find an appropriate placement for Defendant. Defense counsel stated that he had no objection to a retained jurisdiction. The court sentenced Defendant to twenty years in the custody of the Idaho Board of Correction, with three years fixed and seventeen years indeterminate.[1] In sentencing Defendant, the court began by stating that its primary concern was protection of the community. The court also stated that at that point probation was not appropriate. After announcing the sentence, the court stated that "I'm not promising probation," that "I anticipate that we will be able to find an appropriate placement for him in the community," and that "[h]opefully that will occur."

On July 23, 2014, the district court held a hearing to address whether it should suspend Defendant's sentence and place him on probation. The hearing was short because the court announced at its beginning, "After discussing this in chambers, I am very concerned that we need more information on where he'd be placed." The court's concern was that Defendant needed supervision and to be behind locked doors where he will not be free to roam. Before continuing the hearing, the court stated with respect to Defendant:

> If he's going to be put on probation, it's going to have to be in a situation that is going to provide appropriate protection for the community. This is more about the community than it is about Mr. Dabney. That is my primary concern. I do not want to put Mr. Dabney into prison, but I have to be assured that whatever facility he's placed in is going to be a facility that is going to provide the appropriate amount of supervision.

---

[1] During the fixed period of the sentence, the defendant is not eligible for parole; during the indeterminate period, the defendant may be considered for parole. I.C. § 19-2513(1).

2

On August 7, 2014, the district court held another hearing to address whether Defendant should be placed on probation. An entity called the Curtis House had been suggested as a placement for him if he was placed on probation. The court began the hearing by stating that it was not convinced that the Curtis House was appropriate because it was an assisted-living home for the elderly where there was a potential that children would come to visit and the court did not believe the facility was capable of monitoring a sex offender. The court stated that the Belmont House had been suggested, but some other judges had stated that the Department of Health and Welfare had released persons from that facility once it concluded that they were stable. The court asked defense counsel to look into that facility, and the court added that if it were to place Defendant on probation in the Belmont House, it would require a court hearing before he could be released from that facility.

On September 18, 2014, the district court held another hearing to address whether Defendant should be placed on probation. At the commencement of the hearing, the court stated that it did not appear that the Belmont House would be appropriate because it releases residents if its testing shows that they have an IQ that is 75 or above. Defendant's IQ was tested twice, with one psychologist determining that he had an IQ of 74 and another psychologist determining that he had an IQ of 79. The court stated that Defendant was too high of a risk to the community to risk his release into the community. The court also noted that the report from the Department of Correction indicated that Defendant was not very cooperative in treatment and did not complete treatment. The psychologist who conducted the psychosexual evaluation of Defendant concluded that he had a low level of amenability for treatment. The court reviewed the two known options for placement. It stated that its concern with the Belmont House was that the facility could simply decide to release Defendant and that its concern with the Curtis House was that it was essentially a long-term Alzheimer care facility for elderly people who had memory problems and were therefore vulnerable. Defense counsel asked for additional time to provide additional information to the court and/or to have Belmont House test Defendant to see if he was eligible for that facility. The court responded that it was not focused on the result of Belmont House's testing because IQ is not static. The court's concern was that the facility takes the position that it can determine whether a person should be placed back in the community. The court granted defense counsel's requested continuance.

On October 20, 2014, the district court held its final hearing to determine whether to place Defendant on probation. Neither party offered any evidence, only argument. The court explained that nobody had suggested an appropriate placement that would protect society and provide Defendant appropriate treatment and supervision. The court noted that only two placements had been suggested: the Curtis House and the Belmont House. With respect to the Curtis House, the court stated that there was no indication that it was a secure facility and that it had appropriate procedures for protecting the other vulnerable adults in the facilities or children who visited them from Defendant. In addition, the court stated that Defendant was a hypersexual sex offender and there was no indication that he would receive any treatment in the Curtis House. With respect to the Belmont House, the letter from that facility stated that if Defendant's "IQ is over 75 we would be forced to release him from our care." The court noted that at the prior hearing the deputy prosecuting attorney had stated that in another instance a defendant had initially been assessed with having an IQ of 74, but when the defendant became a problem the Belmont House reassessed him, determined that his IQ was over 74, and released him from the facility. With respect to that policy, the court stated that it "feels strongly that I am not going to cede my responsibilities to ensure that the public is appropriately protected from an individual who is sexually offending against children and potentially adolescents to an agency that can reassess that person at any time."

The district court determined that no suitable community placement had been found where Defendant could be appropriately monitored to protect society and could receive appropriate treatment in order to mitigate his risk in the future. Therefore, it relinquished jurisdiction over Defendant and remanded him to the custody of the Idaho Board of Correction for execution of his sentence.

On February 13, 2015, Defendant filed a motion pursuant to Rule 35(b) of the Idaho Rules of Criminal Procedure asking the court to reconsider his sentence. The district court determined that Defendant had not presented any new information in support of the motion, but simply sought to reargue the sentence. The court recited that Defendant had sexually molested the two six-year-olds more than once, that his psychosexual examination showed that he had low amenability to treatment but moderate to high risk to reoffend, and that no suitable placement in the community could be found that would protect society, especially prepubescent children, and provide rehabilitation. The court therefore denied the motion. Defendant timely appealed.

4

## II.
## Did the District Court Abuse Its Discretion in Sentencing?

Defendant contends that the district court abused its discretion in imposing a sentence of twenty years, with three years fixed and seventeen years indeterminate. "We review the length of a sentence under an abuse of discretion standard." *State v. Al-Kotrani*, 141 Idaho 66, 70, 106 P.3d 392, 396 (2005). "When a sentence is challenged as being excessively harsh, we independently review the record on appeal, having due regard for the nature of the offense, the character of the offender, and the protection of the public interest." *State v. Jeppesen*, 138 Idaho 71, 76, 57 P.3d 782, 787 (2002). "[W]hen doing so we consider the defendant's entire sentence." *State v. Oliver*, 144 Idaho 722, 726, 170 P.3d 387, 391 (2007). However, "[w]e presume that the fixed portion of the sentence will be the defendant's probable term of confinement. That is because whether or not a defendant serves longer than the fixed portion of the sentence is a matter left to the sole discretion of the parole board . . . ." *Id.* (citation omitted). "When determining whether the sentence is excessive, we must consider: (1) the protection of society; (2) deterrence of the defendant and others; (3) the possibility of the defendant's rehabilitation; and (4) punishment or retribution for the defendant." *State v. Strand*, 137 Idaho 457, 460-61, 50 P.3d 472, 475-76 (2002). "In order to show that the sentence imposed was unreasonable, the defendant must show that the sentence, in light of the governing criteria, is excessive under any reasonable view of the facts." *State v. Cannady*, 137 Idaho 67, 73, 44 P.3d 1122, 1128 (2002).

In arguing that his sentence was excessive, Defendant points to mitigating circumstances including his unstable and abusive upbringing, his sexual abuse at age ten by an older boy, his intellectual disability, his psychiatric issues and the necessity that he take psychotropic medications, his need for treatment, and his remorse. The district court based its sentencing decision primarily upon the need to protect the community. The psychosexual evaluation recommended that Defendant begin treatment in a structured environment and transition to a community-based setting if progress was demonstrated. The district court determined that no suitable community placement had been found where Defendant could be appropriately monitored to protect society, could receive appropriate treatment in order to mitigate his risk in the future, and would not be released into the community without prior court approval.

5

Defendant had served about eleven months in custody by the date of his sentencing, and his sentence included commitment to the custody of the Idaho Board of Correction with the district court retaining jurisdiction over Defendant for a period of up to 365 days pursuant to Idaho Code section 19-2601. A period of retained jurisdiction is often called a "rider." During that period, the defendant is usually placed in a penal facility other than the main prison where he can be evaluated and can participate in educational and counseling programs. The Department of Correction will provide a written report and recommendation to the sentencing court regarding the defendant. No longer than thirty days after the period of retained jurisdiction has expired, the sentencing court can decide whether to suspend the sentence and place the defendant on probation or to relinquish jurisdiction, in which case the defendant will serve his or her sentence. *Id*.

If the court decided to relinquish jurisdiction at the end of that year, Defendant would have about one year remaining on the fixed portion of his sentence and seventeen years indeterminate. The fixed portion of his remaining sentence would provide time for additional treatment, and the indeterminate time would permit the parole board, in its discretion, to release Defendant for community-based treatment and an extended period of community supervision for protection of the community and further mandated treatment as necessary. Defendant has not shown that the court abused its discretion in pronouncing its sentence.

**III.**
**Did the District Court Abuse Its Discretion in Relinquishing Jurisdiction?**

Defendant contends that the district court abused its discretion in relinquishing jurisdiction because of mistaken beliefs regarding the Curtis House and the Belmont House. With respect to the Curtis House, Defendant contends that the district court erroneously believed that it was not approved by the Idaho Department of Correction and that it had been recommended only because Defendant's stepmother was friends with the owner. With respect to the Belmont House, Defendant contends that the court improperly relied upon anecdotal claims of the deputy prosecutor that it had previously re-evaluated a defendant who had become a problem and released him when the re-evaluation showed an IQ above 74. We need not address these alleged errors because it is clear from the record that they were not the basis of the court's decision.

6

The psychologist who performed a psychosexual evaluation of Defendant recommended that he begin receiving treatment in a structured environment; that he not be transferred to a community-based setting until he progressed in treatment; and that if progress was not demonstrated he should remain in a structured environment. At the beginning of the review hearing held on July 23, 2014, the district court stated that counsel had discussed the case in chambers and that the court needed more information about where Defendant would be placed. They had apparently discussed the Curtis House. The court stated that it would only place Defendant on probation in a situation that was going to provide appropriate protection for the community and that the court had to be assured that the facility would provide the appropriate amount of supervision. The hearing was therefore continued.

At the beginning of the review hearing held on August 7, 2014, the district court stated that it had met in chambers with counsel, that it did not feel comfortable placing Defendant in the Curtis House because children could come to visit the residents there, and that it was not convinced that the Curtis House was capable of monitoring a sex offender. The court suggested that defense counsel investigate the Belmont House. The court stated, however, that it would not place Defendant in the Belmont House unless Defendant would not be released from that facility without prior court approval. The review hearing was continued again.

At the beginning of the review hearing held on September 18, 2014, the court stated that it had received that morning from defense counsel materials regarding the Belmont House. The letter from the Belmont House stated that Defendant needs to have a full scale IQ lower than 75 and that he could be admitted to the facility prior to having a full scale IQ test completed, "but if his IQ is over 75 we would be forced to release him from our care." During the hearing, the deputy prosecutor recounted that another defendant had been admitted to the Belmont House, but when he started causing problems the facility retested him, decided his IQ was above 75, and released him. The court stressed, "My primary job as a judge is to protect the community." The court expressed its concern that the Belmont House was not a "locked-down" facility and emphasized that "here's the bottom line: I am not going to cede to any other authority the right whether to place Mr. Dabney into the community." The court continued the hearing so that defense counsel could present testimony regarding the Curtis House and the Belmont House.

At the hearing held on October 20, 2014, the court asked defense counsel if he had any witnesses, and defense counsel stated that he did not. After hearing argument from counsel, the

court stated that it would relinquish jurisdiction because no placement had been found that would both protect the community and provide appropriate treatment to and supervision of Defendant. The court stated:

> In this particular case I want to make it really clear why I am relinquishing jurisdiction at this point. I have met with counsel numerous times in chambers as well as in the court to attempt to find a suitable placement for Mr. Dabney that— that accomplishes two things; the protection of the community, but at the same time provide an appropriate placement where Mr. Dabney will not just get the appropriate treatment but also supervision. No one has been able to identify an appropriate place for placement.

The court concluded by reiterating, "This Court feels strongly that I am not going to cede my responsibilities to ensure that the public is appropriately protected from an individual who is sexually offending against children and potentially adolescents to an agency that can reassess that person at any time."

"To determine whether a trial court has abused its discretion, this Court considers whether it correctly perceived the issue as discretionary, whether it acted within the boundaries of its discretion and consistently with applicable legal standards, and whether it reached its decision by an exercise of reason." *Reed v. Reed*, 137 Idaho 53, 57, 44 P.3d 1108, 1112 (2002). Throughout the hearings regarding relinquishing jurisdiction, the court made it clear that Defendant would not be placed on probation unless there was a placement that was a secure facility where Defendant would be appropriately supervised, would receive appropriate treatment, and would not be released without prior court approval. Defendant had ample opportunity to provide evidence regarding the Curtis House and the Belmont House to allay the court's concerns, but did not do so. Defendant has not shown that the court abused its discretion in relinquishing jurisdiction. The court knew that its decision was discretionary, it acted within the boundaries of its discretion and consistently with applicable legal standards, and it reached its decision by the exercise of reason.

## IV.
### Did Failing to Place Defendant on Probation Violate His Constitutional Rights?

Relying upon *Bearden v. Georgia*, 461 U.S. 660 (1983), Defendant contends his constitutional rights were violated by the district court's decision not to place him on probation. The issue in *Bearden* was "whether a sentencing court can revoke a defendant's probation for

failure to pay the imposed fine and restitution, absent evidence and findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate." *Id*. at 665. The Supreme Court resolved that issue by holding, "If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment." *Id*. at 672. Defendant contends that the court violated his constitutional rights "by incarcerating him simply because it believed Idaho has no suitable housing for Mr. Dabney." Defendant admits that he did not raise this issue in the district court. Therefore, he asserts that the district court's action constituted fundamental error, which can be raised for the first time on appeal.

Where the alleged error was not followed by a contemporaneous objection, it is only reviewed on appeal under our fundamental error doctrine if the alleged error: "(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless." *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010).

*Bearden* dealt with the treatment of indigents in the criminal justice system. *Bearden*, 461 U.S. at 664. It listed various cases involving indigent criminal defendants who claimed a violation of their constitutional rights, *id*. at 664-65, and then stated, "Due process and equal protection principles converge in the Court's analysis in *these cases*." *Id*. at 665 (emphasis added). The Court stated that the analysis of the issue "requires a careful inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . . .' " *Id*. at 666-67. The *Bearden* analysis has no application here. This case does not involve the alleged deprivation of an indigent defendant's constitutional rights or discrimination against him due to his indigency.

Even if we applied that analysis, there was not even a colorable violation of Defendant's constitutional rights. The defendant in *Bearden* contended that he was treated differently from a probationer who was able to pay a fine due simply to the fact that he was indigent. Here, there is no contention that Defendant was treated differently from other defendants because he was indigent. The defendant in *Bearden* was on probation, and so he had a significant liberty interest in remaining on probation. *Id*. at 671; *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973). In this

9

case, Defendant had already been sentenced to prison on October 9, 2013, and the issue before the district court on October 20, 2014, was whether the court would suspend the sentence and place him on probation. Defendant here had no constitutional or inherent right to be released prior to the expiration of his prison term. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). His liberty right had been extinguished when he was convicted, and at most he simply had a unilateral desire for probation. *Id.* The possibility that he would be placed on probation was no more than a hope that he would receive that benefit, which is not protected by due process. *Id.* at 11. Defendant acknowledges that in sentencing him the State had interests in "ensuring public safety, followed by rehabilitation, deterrence, and retribution," but he asserts that "the classification drawn here—probation-worthy defendants with developmental disabilities versus probation-worthy defendants without disabilities—is not rationally related to any of those interests." The fallacy of that argument is that Defendant was not a "probation-worthy" defendant precisely because there was no placement that would ensure protection of the community and provide appropriate treatment. Finally, Defendant contends that the court was constitutionally required to search neighboring states for facilities that may have been appropriate placements as alternatives to incarceration. Defendant relies upon the statement in *Bearden* that "[o]nly if the sentencing court determines that alternatives to imprisonment are not adequate in a particular situation to meet the State's interest in punishment and deterrence may the State imprison a probationer who has made sufficient bona fide efforts to pay." *Bearden*, 461 U.S. at 672. That statement was made regarding a defendant who had a liberty interest in remaining on probation and was unable to comply with the condition of probation that he pay a fine. Here, Defendant did not have any liberty or other constitutional right to be placed on probation, and Defendant has not cited any authority holding that the Constitution requires sentencing courts to scour other states to see if there is some facility there that would be an alternative to incarceration.

There is no contention or evidence showing that Defendant received a more severe sentence than that which he would have received had he not been developmentally disabled. What he actually contends is that he should have received a less severe sentence than others because he is developmentally disabled. In essence, he contends that a sentencing court should disregard community protection when sentencing developmentally disabled defendants. The

district court's decision to not place Defendant on probation clearly did not violate any of his constitutional rights.

## V.
### Did the District Court Abuse Its Discretion in Denying the Motion to Reduce Defendant's Sentence?

After the district court relinquished jurisdiction, Defendant filed a motion seeking a reduction of his sentence. He supported the motion with a letter dated January 6, 2015, from a Department of Correction employee who was Defendant's case manager while he was serving the rider. The case manager stated that he had reviewed Defendant's records, that "overall he appears to be doing well," that he only had one disciplinary offense report, that he "continues to meet with his current case manager to discuss programming options," that he "is currently enrolled in two clinical groups," that he "appears to be able to find productive use of his time," that he "keeps a low profile," and that he "appears to be acclimating well." Defendant also included a prison record containing summaries from October 28, 2014, through January 6, 2015. The summaries show that Defendant enrolled in classes to obtain a GED and describe his violation of a prison rule.

In denying the motion for reconsideration of Defendant's sentence, the district court quoted from this Court's opinion in *State v. Huffman*, 144 Idaho 201, 159 P.3d 838 (2007), wherein we stated, "When presenting a Rule 35 motion, the defendant must show that the sentence is excessive in light of new or additional information subsequently provided to the district court in support of the Rule 35 motion." *Id*. at 203, 159 P.3d at 840. The court held that Defendant had not presented any new information, but "merely updated how he is presently doing."

Defendant contends that the district court erred because he had provided "new" information, as described above. In denying the motion, the court reiterated,

> His psychosexual examination suggests he is [sic] low amenability to treatment but moderate to high risk to reoffend. The Court considered his low intellectual functioning and mental health problems but given the risk to the community, the Court attempted to allow his counsel to find a suitable placement. His counsel found none. The Court itself attempted to find a suitable alternative but could not.

11

The information that Defendant had provided to support his motion was entirely irrelevant to the reasons the court repeatedly stated for imposing the sentence that it did.  There was nothing in the information provided indicating that Defendant's risk to the community had been lessened or that there was an appropriate community-based facility for him.  We review the denial of the motion for reduction of sentence for an abuse of the court's discretion.  *Id*. Defendant has not shown that the district court abused its discretion in denying the motion.

## VI.
## Conclusion.

We affirm Defendant's sentence, the court's order relinquishing jurisdiction, and the court's order denying the motion to reduce the sentence.

Chief Justice J. JONES, Justices BURDICK, W. JONES, and HORTON **CONCUR.**